767 So.2d 64 (2000)
Scott and Connie SIMON, Individually and on Behalf of their minor children, Keri, Scott, Annie, David and Christopher Simon
v.
AMERICAN CRESCENT ELEVATOR COMPANY and Ridgid Company, a/k/a the Ridge Tool Company.
No. 99-CA-2058.
Court of Appeal of Louisiana, Fourth Circuit.
April 26, 2000.
Writ Denied November 13, 2000.
*66 George J. Nalley, Jr., Dona J. Dew, George J. Nalley, Jr., APLC, Metairie, Louisiana, Counsel for Plaintiffs-Appellees Scott And Connie Simon, Individually and on Behalf of their minor children.
*67 Dominic J. Gianna, Alan D. Weinberger, Middleberg, Riddle & Gianna, New Orleans, Louisiana, and Edward F. Kohnke, IV, Francis H. Brown, III, Frederick Thomas Greschner, Jr., Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, Louisiana, Counsel for Defendant-Appellant Ridgid Company a/k/a Ridge Tool Company.
James A. Babst, Lamothe & Hamilton, P.L.C., New Orleans, Louisiana, and Victor E. Schwartz, Mark A. Behrens, Barry M. Parsons, Crowell & Moring LLP, Washington, D.C., and Jan S. Amundson, National Association Of Manufacturers, Washington, D.C., and Sherman Joyce, American Tort Reform Association, Washington, D.C., Amici Curiae.
Court composed of Chief Judge ROBERT J. KLEES, Judge WILLIAM H. BYRNES, III, Judge MICHAEL E. KIRBY.
KLEES, Chief Judge.
In this products liability suit, both the plaintiffs and defendant appeal a jury verdict in favor of Scott and Connie Simon, individually and on behalf of their minor children, finding the Ridgid 300 pipe threader unreasonably dangerous. The jury found that plaintiff, Scott Simon, was injured when defendant, Ridge Tool Company, failed to adequately warn of an inherent characteristic of their product, the Ridgid 300 power drive unit. For the following reasons, we affirm.

I. FACTS AND PROCEDURAL BACKGROUND
Plaintiff Scott Simon (Simon) was injured while working for Schindler Elevator Company at the Municipal Auditorium during its conversion to the Harrah's temporary casino. Specifically, Simon was responsible for drilling a hole which would house the shaft of a new hydraulic elevator that Schindler was to install. To drill this hole, Schindler used a drilling rig, built by American Crescent Elevator Company, which incorporated a Ridgid 300 power drive unit. This Ridgid 300 is an electric motor-driven power drive, manufactured by Ridge Tool Company in 1965, to be used as a pipe threader. Simon testified that on February 17, 1995, he arrived at work and realized that the safety cable on the drilling rig had been left unattached by an earlier shift. Because the drilling rig was located between floors and because there was an obstruction in the hole which prevented the drilling rig from being lowered, Simon had to break apart the drill pipe, section by section, in order to manually lower the rig and place the safety belt back on. While doing this, the Ridgid 300 power drive suddenly broke and the lower portion of the rig fell on Simon, crushing his vertebrae and severing his spinal cord. Simon was rendered a paraplegic. Schindler discovered, upon disassembling the Ridgid 300 involved in the accident, that the lower portion of the unit was held together by three screws, which had sheared at the tips.
Simon, along with his wife and five children, filed suit against Ridge Tool Company and American Crescent Elevator Company alleging under the Louisiana Products Liability Act that the Ridgid 300 was unreasonably dangerous (1) in design, and (2) because of an inadequate warning. American Crescent Elevator Company settled prior to trial. After trial, the jury found that the Ridgid 300 was unreasonably dangerous in that it contained an inadequate warning, and awarded a total of $10,750,000.00 in damages. Simon was awarded $6,400,000.00 for pain and suffering, $1,000,000.00 for medical and rehabilitation expenses and $1,200,000.00 for lost wages. The jury assessed Connie Simon's (Connie) loss of consortium claim at $900,000.00. Each of Simon's five children was awarded $250,000.00. The jury apportioned 65% fault to Schindler, 20% fault to American Crescent and 15% fault to Ridge Tool. The trial court reapportioned Schindler's fault to Ridge Tool and American Crescent because Schindler was statutorily *68 immune from suit under the Louisiana Workers' Compensation. After the reapportionment of fault, Ridge Tool's liability increased to 43% of the total award, or $4,622,500.00. Thereafter, Ridge Tool moved for judgment notwithstanding the verdict or, in the alternative, for new trial and/or remittitur, which was denied.
The Simons appeal contending (1) that the jury was manifestly erroneous in finding American Crescent was negligent and thus, allocating any fault to American Crescent, (2) that the jury was manifestly erroneous in failing to award the full amount of special damages proven at trial, and (3) that the jury was manifestly erroneous in finding the Ridgid 300 was not unreasonably dangerous in design.
Ridge Tool appeals contending (1) that the trial court erred as a matter of law in allowing the case to proceed to the jury and in denying Ridge Tool's directed verdict or its Motion for a JNOV, (2) that the jury was manifestly wrong in determining that the Rigid 300's dangerous characteristic resulted from a reasonably anticipated altercation or modification of the product, and that the Ridgid 300 was unreasonably dangerous because of an inadequate warning, (3) that the trial court erred as a matter of law in allowing the case to proceed to the jury and in denying Ridge Tool's motion for a JNOV, (4) that the jury was manifestly wrong in failing to allocate fault to the plaintiff, (5) and that the damages awarded by the jury are excessively high and the trial court erred in failing to reduce them.

II. ANALYSIS

A. Applicable Legal Principles

1. Products liability
The Louisiana Products Liability Act (LPLA) establishes the exclusive theories of recovery against manufacturers for damage caused by their products. Louisiana Revised Statute 9:2800.54 states:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if...
(2) The product is unreasonably dangerous in design ...;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided ...; or
C. The characteristic of the product that renders it unreasonably dangerous... must exist at the time the product left the control of its manufacturer ... or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.

a. Unreasonably Dangerous in Design
Section 2800.56 of the LPLA provides:
A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

*69 b. Unreasonably Dangerous because of Inadequate Warning
Section 2800.57 of the LPLA provides:
A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
B. A manufacturer is not required to provide an adequate warning about his product when:
(1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacturer A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

2. Standards of Review

a. Manifest Error
A reviewing court may not set aside a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). In order to reverse a fact finder's determinations, the appellate court must find from the record that: 1) a reasonable factual basis does not exist for the finding of the trial court, and 2) the record establishes that the finding is clearly wrong (manifestly erroneous). See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the jury's findings. The reviewing court must review the record in its entirety to determine whether the jury's finding was clearly wrong or manifestly erroneous. Stobart v. State, through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La.1993). Thus, even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell, 549 So.2d at 844; Stobart, 617 So.2d at 882. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.

b. Abuse of Discretion
The jury, being the trier of fact, is given much discretion in the assessment of damages. La.C.C. art. 2324.1. Upon appellate review, damage awards will be disturbed only when there has been a clear abuse of that discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La. 1993). The initial inquiry is whether the award for the particular injuries and their effects on the particular plaintiff under the particular circumstances is a clear abuse of the much discretion of the trier of fact. Reck v. Stevens, 373 So.2d 498, 501 (La. 1979). A comparison of other awards in other cases is appropriate only after the appellate court finds such abuse of discretion. Then it is proper to resort to prior *70 awards only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

B. Summary of Trial Testimony
Eugene Revolinsky, the Director of Engineering Services for Ridge Tool, testified that Ridge Tool designed the Ridgid 300 power drive unit and that this particular unit involved in Simon's accident was manufactured in 1965. Revolinsky testified that it was Ridge Tool who decided to use the three internal set screws to hold the Ridgid 300's two components together. Further, he testified that if the 300 power drive unit is in a vertical configuration, the only thing holding the upper third and the lower two-thirds together are the tips of the three set screws. Revolinsky testified that the normal and average user would neither be aware nor have any dealings with the internal three set screws used in the 300 power drive unit. Revolinsky also testified that the Ridgid 300 involved in Simon's accident did not have any warnings at all placed on it. Finally, Revolinsky testified that based on his superior knowledge of the inner make-up of the Ridgid 300, he would not stand underneath the power unit when it was placed in a vertical position.
Jesse Brian Edwards, a Salesman Manager for an industrial supply house authorized to sell Ridge Tool Equipment, testified that he had visited several elevator job cites, when a Ridgid 300 was incorporated into a drilling rig similar to the one used in Simon's accident. Specifically, he testified that on those occasions when he was visiting the elevator cites, the Ridgid 300 was usually being used to drill a whole for a hydraulic cylinder. Edwards testified that the elevator companies drilling the holes with the Ridgid 300 also had the rig suspended from the top of the elevator shaft. Further, Edwards testified that in all of the time he was authorized to sell Ridge Tool equipment, he never saw anything from Ridge Tool that told him that it would be dangerous to use the equipment, not just in an elevator drilling rig like this, but in a vertical fashion at all. Edwards testified that neither in his training nor in his discussions with the Ridge Tool factory representatives, was he ever told that the Ridgid 300 power unit is held together by three small set screws. Moreover, Edwards testified that Ridge Tool never provided him with any information, warnings or other documentation that if the Ridgid 300 power drive unit was used in a vertical configuration, that the set screws could break and that the rig could fall apart. Edwards also testified that it was his impression that Mr. Brocklahurst, a Ridge Tool factory representative, knew that the Ridgid 300 power unit was being used by the elevator industry in drilling configurations.
Gerald Whitehouse, a mechanical engineer, testified that the designer and manufacturer of the Ridgid 300 "could reasonably anticipate that this particular unit would be used for something other than threading pipe. And the basis for that is that this unit is a very powerful turning device and there's just no question that if one wants a unit like this, not only to drill water wells or to drill elevator holes, it could be used in a number of other vertical applications." Whitehouse testified that, in his opinion, if the Ridgid 300 is used "in a vertical direction it has an internal flaw in that the set screws support the vertical weight of the unit, plus any attachments to the unit. And that it must be supported then aside from that because those screws then determine the integrity of the entire unit." Additionally, Whitehouse testified that "since this design characteristic is in the machine and foreseeable that it could be used and would be used in the vertical direction that there were no instructions, warnings, and so forth would indicate to a user, which is not obvious, that this internal characteristic existed." Whitehouse *71 testified that "if the hazard is not open knowledge to the user, then you've got to communicate with them in some way. You've either got to instruct or warn against that hazard."
Robert McQuire, an elevator mechanic, testified that he was not aware that when the Ridgid 300 is placed in a vertical position, that the upper and lower portion of the unit is held together by three small set screws internally. McQuire also testified that prior to Simon's accident, he specifically showed a Ridge Tool District Manager a Ridgid 300 being used in a vertical configuration for drilling. Further, McQuire testified that the Ridge Tool representative, upon seeing the Ridgid 300 being used vertically, failed to warn or give directions that it was dangerous to use the Ridgid 300 in a vertical position.
Alan Hollingsworth, a Superintendent for Malar Elevator Service Company and who has been in the elevator business for twenty-six years, testified that elevator companies have been using the Ridgid 300 to drill holes in elevator shafts as early as 1976. Hollingsworth testified that the use of the Ridgid 300 was a common method for drilling holes in the elevator business and that he, personally, had drilled about twenty five of them. Hollingsworth further testified that he has used the Ridgid 300 unit interchangeably between drilling and threading and that it only requires taking the power unit off of the tripod and putting it on a rig.
John Anthony Todesco, an elevator service mechanic, testified that he has gone to Rigid Tool's distributor houses and discussed with them the fact that the Ridgid 300 was being used in a vertical configuration for drilling purposes. He testified that the Ridge Tool representatives never told him that there was anything wrong with using the unit vertically. Todesco testified that when he disassembled the Ridgid 300 that fell on Simon, he found that the bearings were worn and that all three of the screws, the tips of them, had sheared off.
Dennis Wade, an authorized Ridge Tool distributor, testified that based on his discussions and interactions with Mr. Brocklahurst, the Ridge Tool district manager, Brocklahurst was aware that the Ridgid 300 was being used for drilling purposes. Wade also testified that he was not aware of anything in the Ridgid catalogues, manuals or any type of other literature where Ridge Tool ever told anyone that there was a potential danger with using the Ridgid 300 power drive unit in a vertical configuration. Wade testified that he was not aware that the only support for the Ridgid 300, in a vertical configuration, were the three small set screws.

C. The Simons' Appeal

1. American Crescent's Liability
The Simons contend that the jury was manifestly erroneous in finding American Crescent was negligent because there was no evidence presented at trial from which a reasonable juror could find American Crescent negligent or in any way responsible for the accident. Thus, the Simons allege that they are entitled to an order vacating the assessment of fault and that fault should be reallocated among defendants Ridge Tool and Schindler Elevator. We find this argument without merit.
Although there is no expert testimony regarding American Crescent's negligence in the record, as the Simons settled with this defendant prior to trial, we nonetheless do find sufficient facts in the record to support the jury's finding of liability on the part of American Crescent.
The jury instruction given for the rule of negligence stated, "Negligence is the doing of some fact which a reasonably prudent person would not do or the failure to do something which a reasonably prudent person would do under the particular circumstances at the time." In this case, the jury found that the Ridgid 300 was unreasonably dangerous because of an inadequate warning and that this unreasonably dangerous product caused Simon's accident. *72 The jury also heard evidence that American Crescent was the builder of the elevator rig that had incorporated the "unreasonably dangerous" Ridgid 300 power unit. Specifically, Louis Funck, the builder of the elevator rig which incorporated the Rigid 300, testified in his deposition that while he was working for American Crescent, he assembled the Ridgid 300, supplied by Ridge Tool, into the elevator drilling rig which fell on Simon. Jesse Edwards, a salesman for Ridge Tool equipment, testified that various things were done to the Rigid 300 to transform the power unit into a drill rig. Edwards testified that Ridge Tools does not make or supply the "ankle irons," "sleeves," "stabilizer arms," "kelley," "hook and U-bolt," or "drill bits" that are located on the American Crescent drill rig. Further, Robert McQuire, who has worked in the elevator industry for over fifteen years, testified that the Ridgid 300 is just a hard drive unit but that on "the American Crescent rig, they [the rigid 300] pretty much are attached solidly." Because American Crescent built its own rig, it had a duty to assure the users of the elevator rig that the components used in the making of the rig were safe and thus, not unreasonably dangerous. American Crescent breached this duty when it lent Schindler Elevator Company the elevator rig without knowing the internal make-up of the Ridgid 300, the most significant part of the elevator rig. Thus, the jury could reasonably conclude that Simon's accident was, in part, caused by American Crescent's failure to research the Ridgid 300 and to discover that the Rigid 300's two components were held together by three screws. Accordingly, we find that based on the facts of this case, the jury could find that American Crescent failed to assure the users of its elevator rig that the product was free of any hidden dangers. Hence, we find that the jury's assessment of fault to American Elevator is reasonable and is supported by the record.

2. Special Damages
The Simons argue that the jury committed manifest error by awarding only $1 million in past and future medical and rehabilitation expenses. The Simons contend that the jury awarded almost $300,000.00 less than the lowest uncontroverted evidence presented at trial. Thus, the Simons allege that the jury simply erred in making their calculations of future medical and non-medical special damages, as there was no sound reason for rejecting the undisputed testimony of Simons' witnesses.
The Simons called as their witnesses Larry Stokes, an expert in vocational and rehabilitation counseling, and Dr. Randy Rice, an economist. Stokes, with the help of Simon's treating physician, Dr. Glen, prepared a life care plan for Simon. Dr. Rice then calculated the present day value of the cost of the life care plan. The final itemized plan included: medical services and evaluation, $227,821; equipment needs, $72,511; supplies, $105,202; transportation, $139,763; exercise and phone, $18,333; miscellaneous support, $332,066; past medical bills, $266,835.01; past non-medical expenses, $135,743.62.
After reviewing all of the evidence, we find no abuse of discretion in the special damages awarded. The jury heard Stokes and Rice's testimony taken on both direct and cross-examination. On cross-examination, Stokes testified that, even though a credit was given to Simon for two vans, he did not deduct the cost of the pick up truck that Simon had before the accident. Stokes also conceded that had Simon continued working as an elevator mechanic, the family would have needed a vehicle for its own transportation. Further, Ridge Tool questioned Stokes on whether is was really necessary for Simon to have his car washed every two weeks, to have a cellular phone, or to have a gym membership. The jury may have placed greater weight on the cross-examination of Stokes than on his direct examination in assessing the damages. The jury is afforded *73 this discretion and thus, we do not find that the jury was clearly wrong in awarding Simon $1,000,000.00 of the $1,298,329.63 in medical and rehabilitation expenses.
The Simons also contend that the jury erred by failing to award reasonable damages for the medical services provided by Connie Simon for the past three years and those she will provide in the future. However, the jury interrogatory for special damages states "Medical and rehabilitation expenses and household services, past and future." Accordingly, we agree with Ridge Tool that the jury's special damage award of $1,000,000.00 included "household services, past and future," and thus, the jury did not err in failing to provide damages for the services provided by Connie.

3. The Ridgid 300's Design
The Simons allege that the jury was manifestly erroneous in finding the Ridgid 300 was not unreasonably dangerous in design. Specifically, the Simons argue that the undisputed testimony established that an alternative design existed that, with little additional cost and no impact on the function of the Ridgid 300, would have prevented Simon's accident. The Simons' argument is without merit.
As stated under the LPLA, "[a] product is unreasonably dangerous in design if, at the time the product left its manufacturer's control... [t]here existed an alternative design for the product that was capable of preventing the claimant's damage. The record supports the jury's finding that the Ridgid 300, at the time it left Ridge Tools control, was not unreasonably dangerous in design. At trial, witnesses testified that the original purpose of the Ridgid 300 was to be designed as a pipe threader and to be used in a horizontal position. Specifically, Eugene Revolinsky, Director of Engineering Services for the Ridge Tool Company, testified that "the power drive is designed as a pipe threader. Where the name comes from, 40 or 50 years ago most of the threading was done by hand threaders and power drives were developed so you can use the same manual dye [sic] head and do it by power...[b]ut power drives are pipe threaders." Revolinsky also testified that a pipe threader can not thread pipe in a vertical position. Gerald Whitehouse, a mechanical engineer who testified on behalf of the Simons, stated that the Ridgid 300 is "basically a power drive unit that was originally designed to turn pipe in order to thread, cut and ream the pipe...and I think it's very well designed from the standpoint of the purpose of threading pipe." In fact, Whitehouse testified that the Ridgid 300 was "`an excellent pipe threader.'" Moreover, the record reflects that the Ridgid 300 was only used in a horizontal position as a pipe threader from 1958 to 1970. Accordingly, the jury did not err in finding that, at the time the Ridgid 300 left Ridge Tool's control, there did not exist an alternative design for the product that was capable of preventing Simon's damages.

D. Ridge Tool's Appeal

1. Ridge Tool's Directed Verdict and Motion for JNOV
Ridge Tool contends that the trial court committed legal error in not granting its directed verdict or motion for a JNOV and that this case should never have gone to the jury. Specifically, Ridge Tool argues that the uncontradicted evidence proved that the 300 was not afforded reasonable care, that the 300 was abused to pieces, that the cause of the accident was the abuse of the product by Simon and his employer, and that any "dangerous characteristic" was not the result of a reasonably anticipated alteration or modification of the 300.
The legal standard required by the trial court in ruling on both a directed verdict and a motion for JNOV is whether "after considering the evidence in the light most favorable to the party opposed to the motion, [the trial court] finds that it points so strongly and overwhelmingly in favor of *74 the moving party that reasonable minds could not arrive at a contrary verdict on that issue." Moore v. Safeway, Inc., 700 So.2d 831, 95-1552 (La.App. 1 Cir.1996) citing Belle Pass Terminal, Inc., 92-1544, at p. 42, (La.App. 1 Cir.1994), 634 So.2d 466, 492. See also Scott v. American Olean Tile Co., Inc. 97-1080, (La.App. 3 Cir.1998), 706 So.2d 1091, 1092. Thus, a trial court may only grant a directed verdict or a JNOV when the evidence overwhelmingly points to one conclusion. Id. at 1093
After a review of the record, we are convinced there is sufficient evidence to conclude that plaintiffs have proved a prima facie case under the Louisiana Products Liability Act. Further, based on that evidence, we find reasonable minds could conclude that plaintiffs have proved that defendant's product, the Rigid 300, was unreasonably dangerous because of an inadequate warning. Accordingly, the case was properly before a jury and the trial court did not err in its denial of defendant's directed verdict and motion for JNOV.

2. No Reasonably Anticipated Use
Ridge Tool argues that Ridge Tool cannot be held responsible for Simon's accident because Plaintiffs failed to prove that Simon encountered a dangerous characteristic that either existed at the time the Ridgid 300 left Ridge Tool's control or resulted from a reasonably anticipated alteration or modification of the product. Ridge Tool's argument is without merit.
The instructions given to the jury on Louisiana's Product Liability Law stated, "[t]he manufacture of a product shall be liable to a claimant for damages proximately caused by a characteristic of a product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant." The definition of a "reasonably anticipated use" given to the jury was "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstance." The instructions given to the jury on inadequate warnings stated:
A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and is danger to users and handlers of the product.
The jury was also instructed that a manufacturer may be liable under a post-sale duty to warn. The jury instruction stated:
A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonable prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
First, the record reflects sufficient evidence for the jury to find the fact that Rigid Tools should have reasonably expected the Ridgid 300 to be used as a power tool in a vertical position. Specifically, Whitehouse testified that the designer and manufacturer of the Ridgid 300 "could reasonably anticipate that this particular unit would be used for something other than threading pipe. And the basis for that is that this unit is a very powerful turning device and there's just no question that if one wants a unit like this, not only to drill water wells or to drill elevator holes, it could be used in a number of other vertical applications." Second, we agree with the Simons that the evidence presented at trial supports a finding that Ridge Tool failed to use reasonable care to *75 provide an adequate warning. Specifically, Ridge Tool failed to notify users of the Ridgid 300 of the dangers associated with having only three set screws holding the Ridgid 300's components together. The jury heard the testimony of Revolinsky, Edwards, McQuire, and Todesco establishing that only Ridge Tool knew that the internal structure of the Ridgid 300 consisted of three set screws. The jury also heard the testimony of McQuire that, prior to Simon's accident, a Rigid Tool representative watched the Ridgid 300 being used in a vertical drilling configuration. Further, Edwards and Wade testified that, as Ridge Tool distributors, they were aware of the Ridgid 300's use in the elevator industry for drilling rigs. Accordingly, we find that there was an adequate evidentiary basis for the jury's determination that Ridge Tool failed in its obligation to provide Simon with an adequate warning, while he was using the Ridgid 300, which would have allowed him to contemplate the danger associated with the Ridgid 300.

3. The Warning and Simon's Liability
Rigid Tool argues that there is no reasonable factual basis in the record for concluding that such a warning would have done anything to assist Simon in evaluating the danger. Nonetheless, Rigid Tool alleges that if a warning would have altered Simon's conduct, then fault should be reallocated to Simon. These arguments are without merit.
In this case, the jury heard Revolinsky's testimony that, based on his knowledge of the inner make-up of the Ridgid 300, he would not stand underneath the power unit when it was placed in a vertical position. The jury also heard Simon's testimony that, on the morning of the accident, "as long as that hook was tight and that chain was taut in there...I didn't see any kind of way of it [the Ridgid 300] coming down." Simon testified that he did not have a clue that the Ridgid 300 could separate into two pieces or that the Ridgid 300 was suspended by the tips of three small set screws. Thus, we find that there is a reasonable factual basis in the record to conclude that a warning about the internal design of the Ridgid 300 would have assisted Simon in evaluating the danger associated with standing under the drilling rig.
The next issue to address is whether Simon acted unreasonably and without exercising the correct amount of regard for his own safety. Again, in allocating zero percent fault to Simon, the jury made a factual determination that Simon was not responsible for the accident. The jury heard Simon's testimony that although he was taught not to stand under a piece of machinery without the safety cable on while it was running, at the time of this accident, the Ridgid 300 was shut down. Further, Simon testified that he would not have stood beneath the Ridgid 300 had he known it could separate. Accordingly, we find that the jury did not abuse its discretion in failing to allocate fault to Simon.

4. Damage Awards
In Ridge Tool's last assignment of error, it alleges that the jury's award of general damages to Simon, and the loss of consortium awards to Connie and the five minor children are excessive. As noted above, the jury is given much discretion in the assessment of damages, and this court will only disturb an award if there has been a clear abuse of that discretion. The jury heard in depth testimony regarding Scott's accident, and how his injuries have affected the lives of the entire Simon family. Accordingly, we find that based on the facts of this case, the jury did not abuse its vast discretion in awarding $6,400,000.00 to Simon, $900,000.00 to Connie and $250,000.00 for each of Simon's five children.
For the reasons stated above, we affirm the trial court's judgment.
AFFIRMED.