28

WALTER R. STARK, Plaintiff-in-Error, v. H. R. YOST and CHARLES E. KARNES, Defendant-in-Error.—334 S. W. (2d) 954.

Western Section, Jackson.   October 22, 1959.

Certiorari Denied by Supreme Court March 11, 1960.

Eulyse M. Smith, Memphis, for Plaintiff-in-Error.

Edward W. Kuhn, Memphis, for Defendant-in-Error.

AVERY, P. J., (W. S.). The plaintiff below, Walter R. Stark, sustained property damage and physical injury

damage when a truck tractor owned by defendant H. R. Yost and driven by defendant Charles E. Karnes went out of control after it struck the concrete balustrade of a bridge, traveled considerable distance and struck the Dodge pickup truck of plaintiff while it was parked with plaintiff sitting in the cab, headed in an easterly direction on the south side of Whitehaven-Capleville Road in Shelby County, Tennessee, on December 19, 1957.

The case was tried to the Court and jury in Division II of the Circuit Court before Honorable John W. Wilson, Judge, in which the jury returned a verdict of $957.80 property damage and $12,500 personal injury damage.

On motion for a new trial filed by defendants on the ground of excessive verdict, among others, the property damage verdict was by consent reduced from $957.80 to $580, and the Court granted a remittitur of $4,000 of the personal injury verdict, which plaintiff accepted under protest, and prayed and perfected his appeal. There was no appeal by the defendants.

The only Assignment of Error in this Court is as follows:

"The plaintiff assigns as error, the fact that the Court reduced the amount of the jury verdict for personal injuries from the sum of Twelve Thousand Five Hundred Dollars ($12,500.00) to Eight Thousand Five Hundred Dollars ($8,500.00)."

Therefore, this Court must review only that part of the record which has to do with the physical injuries received by plaintiff, as shown by the proof, and determine whether or not the amount of the verdict of the jury is exces-

sive or whether the remittitur ordered by the Trial Court is excessive.

The controlling statutes in such a case are those compiled in Sections 27-118 and 27-119, Tennessee Code Annotated, which it is not necessary to copy in this Opinion. This Court, acting under the law compiled in said sections, may determine that the verdict is excessive, that the remittitur of that part of the verdict ordered by the Trial Court is excessive, or, had the question been properly raised, that such remittitur is insufficient.

In Murphy Truck Lines v. Brown, 203 Tenn. 414, 313 S. W. (2d) 440, 443, the Supreme Court reluctantly approved the following to be the authority of the Court of Appeals in such manner, when it said:

"We reach this conclusion based upon the sound hypothesis that if the Court of Appeals can correct the error of the trial judge in declining to suggest any remittitur (Section 27-119, T. C. A.), does not the authority exist, by clear implication, that the trial court was in error in suggesting a remittitur that was excessive? This is indeed a most delicate question for us to decide. However, we think the over all purpose of the foregoing Sections of the Code require this interpretation. The revisory authority of the appellate courts, the Court of Appeals in the instant case, was to avoid repeated trials of factual issues and at the same time do equal justice to the parties. The clear legislative intent, as reflected in the foregoing Sections of the Code, was to confer upon the appellate courts full power and authority to revise and correct all errors consistent with recognized rules of appellate practice and procedure."

In that case there was a verdict for plaintiff of $25,000. The Trial Judge suggested a remittitur of $12,500. Both parties perfected appeals to this Court and this Division of the Court of Appeals reinstated $7,500 of the remittitur ordered by the Trial Judge and entered judgment in favor of the plaintiff for $20,000. In that case a 6-year old child had been killed.

Now, looking to the facts of the instant case as reflected by the record, the plaintiff was a man 73 years of age at the time he was injured, of ordinary intelligence, qualified only to do common labor, and had been farming all of his life; that at the time he either rented or was making a share-crop on a small tract of land in Shelby County, Tennessee, and the record reflects his average annual earnings of between $1,500 and $2,000; that he and his wife lived alone.

Immediately after his injury, he was carried to the Emergency Room at the Methodist Hospital in Memphis and cared for by Dr. M. C. Pian, Jr., a physician and general surgeon with general surgery as his specialty. Dr. Pian testified that when he first saw the plaintiff he was unconscious and he described his injuries as follows:

"He had multiple skin abrasions around the nose and cheeks. They were not deep and not severe enough to require suture repair. However, there were three lacerations of his scalp, one three inches in length, one four inches in length and one one inch in length above the left eyebrow, I think."

He further described one of the lacerations as being a "triangular flap" which was "necrotic", which simply means that the skin was dead in that flap and it had to

be removed with surgical scissors. The other injuries he described as follows:

"The right knee had a jagged laceration just below the bend of the joint on the lateral aspect of the leg."

He explained how that a complete examination of the patient was made to determine whether he had any internal injuries or not, after which the lacerations were "cleansed and debrided and then repaired under a local anesthesia." At another place in his testimony, this witness said that the plaintiff—

"suffered lacerations of his scalp and multiple contusions of his knee, face, chest wall and laceration of the right knee."

This Doctor further stated that X-rays were taken there at the Methodist Hospital of the skull, which revealed no bone injury; that an X-ray of the chest failed to reveal any fracture of the ribs; that an X-ray of the right tibia, including the knee, failed to show any fractures; that an X-ray of the left knee showed no fractures; that an X-ray of the spine showed hypertrophic changes and some deformity of the spinous processes, but that no pain was complained of at that time in that area. The patient was admitted to the hospital where he stayed five or six days. Dr. Pian stated that he saw the patient at home on the 27th of December; that he saw him again on January 3rd, at which time on his limbs there were still some blood stains showing under the skin, his knees were still sore, and that the contusions and lacerations were healing but still had some small scabs in places. He saw him again on January 3rd, again on January 10th, again on January 23rd, again on the 6th of February, and that

the last time he saw him was on the 20th of February when he referred him to an orthopedic doctor. Dr. Pian's charges were $64.

Photographs of the patient taken after he had his lacerations treated were exhibited with the record and Dr. Pian testified that they showed the appearance of the plaintiff soon after he had been treated at the hospital. These photographs reveal the bruises near the wrist of the left arm, bruises and small cuts about the face, the nose considerably bruised, lacerations in the scalp near the hairline, small abrasions about the forehead, bruises on the left knee and the treated cuts on the right knee. These wounds revealed appear superficial.

Dr. W. T. Howard, an orthopedic surgeon to whom the patient was referred by Dr. Pian, examined the plaintiff on or about March 17, 1958, at which time he disrobed the patient, inspected all areas of his body, various scars, made measurement of scars, tested the muscular strength, measured the chest motions, tested the circulation, and describes all objective and subjective symptoms which could be related to the injury. His findings are described as follows:

"A. There were three scars at the scalp, the largest being in this area here (indicating) at the hair line, at the upper forehead. The present condition was thought to be good. The area of the scar was about 1½ inches. There was considerable stiffness of the lower back, and that motion was about half normal. On the front of the right leg below the knee there was a scar which measured 1½ inches. On the front of the left knee there was a smaller scar. The right calf measured 13¾ inches compared

with 14¼ on the left. Considerable stiffness at the right knee was recorded; less stiffness of the left. There was considerable crepitus or grating noticed in both knees. X-ray pictures covering the knees showed considerable degenerative changes on both sides."

This Doctor said that the degenerated changes which he found in the body were explainable by his age and that they had no connection with the accident. He further stated that his evaluation of the percentage of disability was 10% partial permanent as related to the whole body. He further stated that at this man's age his margin of reserve was somewhat smaller than that of the average person, and that he would not be suprised if the effect of his injury would completely "sap his reserve". This Doctor said the patient was complaining of "extensive pain" at that time. Dr. Howard's fee was $60. He saw the patient twice, the last time exactly 12 months from the date he had first seen him.

On cross-examination, this Doctor said the patient had an advanced arthritic condition generally throughout his entire body.

Dr. C. D. Hawkes, a neurological surgeon, examined the patient at the request of counsel for defendants on or about September 30, 1959. He saw the plaintiff again on March 5, 1959, at which time the plaintiff still complained of pain, but so far as the objective examination was concerned it revealed essentially the same condition as before. He stated that in his opinion the plaintiff had a disability of 15% as related to the whole body.

The testimony of plaintiff is that he was knocked unconscious by the collision and knew nothing until he woke up in the Methodist Hospital, where he remained four or five days. At the time of the trial he said he still suffered pain, had been unable to do any work of any kind since the accident, whereas before the accident he was able to do his own farm work.

All of the doctors testified that when they last saw the plaintiff, he had made a very good recovery from the injuries based upon the objective findings. Evidence given by his wife, his son with whom he now lives, and other lay witnesses confirms his statement showing his ability to do any ordinary farm work prior to his injury, and inability since the injury. He had a life expectancy of about 9 years at the time of his injury.

■ It is recognized by all of the courts that there is no mathematical rule of computing the amount of damages in given negligence cases so as to make the judgments uniform when personal injury, pain, suffering, etc. have to be considered.

> "* * * it is the duty of the courts to take into consideration the nature and extent of the injuries, the suffering, expenses, diminution of earning capacity, inflation and high cost of living, age, expectancy of life and amount awarded in other similar cases."

The above is a quotation from an Opinion of this Court, Eastern Division, in Monday v. Millsaps, 37 Tenn. App. 371, 264 S. W. (2d) 6, 25, citing with approval: Town of Clinton v. Davis, 27 Tenn. App. 29, 177 S. W. (2d) 848; Foster & Creighton & Co. v. Hale, 32 Tenn. App. 208, 222 S. W. (2d) 222. Many other cases could be cited as a substantial basis for the above statement.

Even though the amount awarded in similar cases may be an element to be considered by the juries and the courts in arriving at a proper evaluation of damages, it is known to all of us that there are no two cases which show exactly the same injury under similar circumstances to the same aged person. It may be further said that an element to be considered, for whatever it may be worth, in its application to the particular individual and his injury, is the percentage of disability that the injury has caused as related to his entire body and testified to by competent medical experts. It almost reaches a matter of speculation however, to take these percentage related injuries and apply them to the earning capacity of an individual as shown by the proof of a particular case and arrive at any satisfactory method of application.

It has been said so many times in cases wherein the question of the excessiveness of the verdict is at issue, that the Trial Court should not interfere with the jury verdict on the ground of excessiveness unless the amount of the verdict is beyond the range of reasonableness. This simply means nothing less than the conscience of the Court must come into play when considering the reasonableness of a jury verdict and it is his duty to order a remittitur in the event he feels he could not conscientiously approve the amount as fixed by the jury verdict. Waller v. Skelton, 186 Tenn. 433, 445, 211 S. W. (2d) 445; American Lead Pencil Co. v. Davis, 108 Tenn. 251, 66 S. W. 1129; Turner v. Turner, 85 Tenn. 387, 3 S. W. 121; Streetman v. Richardson et al., 37 Tenn. App. 524, 266 S. W. (2d) 838.

In making a determination upon an assignment of error relative to excessiveness of a verdict, we have great

respect for the oft repeated statement in our Opinions and in the Opinions from other jurisdictions that—

"The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence." Reeves v. Catignani, 157 Tenn. 173, 7 S. W. (2d) 38, 39. Monday v. Millsaps, supra.

American Jurisprudence, Vol. 15, Sec. 205, p. 622, is quoted with approval in many of our cases, where it is said:

"Moreover, the question of the excessiveness of a verdict is generally one for the determination of the trial court in the first instance, and its action in granting or refusing to grant a new trial on that ground will not be disturbed on appeal unless an abuse of discretion is shown." Monday v. Millsaps, supra.

There is no good reason why the same rule,—that is, of the Trial Judge's discretion—should not apply when a remittitur is ordered by him and being considered in the appellate courts.

We have quoted herein from the testimony of the physicians and surgeons relative to plaintiff's injury, from the plaintiff's own testimony, as well as the substance of the testimony of his wife and son. No physician testifies to a greater partial permanent disability than 15% as the injuries are related to the whole body of the plaintiff.

Looking at the verdict of the jury from another aspect, it is found that it fixed property damage, by its verdict,

to be the damage to the truck, plus all medical and hospital expenses of the plaintiff, and there was a remittitur in the amount of that property damage verdict, by agreement of the whole amount of the hospital and medical expenses, and it is agreed that this alone shows that the jury acted from passion, prejudice, sympathy or caprice. We do not agree with that argument. The jury may not have understood exactly what the property damage included. Nevertheless, an appellate court must not only have great respect for the verdict of the jury, it must likewise take into consideration the fact that the Trial Judge, experienced in observing persons testifying, is in a better position to determine whether a party who has been injured is exaggerating the result of such injury to his body, either from some psychological reaction or purposely in order to influence the jury verdict, than the average juror possesses, and the appellate courts must likewise have great respect for the evaluation of damages fixed by the Trial Judge or approved by him as relates to the verdict.

The plaintiff in this case has shown himself to be a person who does not have respect for the opinion of others, even his own physician. He emphatically stated, with reference to the physician who took care of him immediately after he was hurt, through the five days in the hospital, and visited him several times thereafter, that he would not believe him at all. On cross-examination, he was asked and answered:

"Q. Dr. Pian was the doctor over at the hospital. A. Yes, sir.

"Q. And whatever he testified to about your condition you would believe? A. No, not a word.

"Q. Sir? A. Not a word.

"Q. You don't—you say not a word? A. That is exactly right.

"Q. You don't believe Dr. Pian? A. No, sir; I sure wouldn't. I ain't kidding you, I wouldn't believe nothing he said.

"Q. You don't believe your own doctor? A. He was none of my doctor. I didn't get him or hire him and I don't believe what he said. I wasn't for him, wanted them to call in another doctor."

Taking into consideration the disposition of the plaintiff, on the witness stand, as viewed by the Trial Court, and that the Trial Judge saw the other witnesses, except two of the physicians, we do not feel that we could conscientiously say that he abused him discretion or that he erroneously acted in reducing the verdict of the jury in this case by almost 33 1/3%. It is true, as hereinbefore stated, that this Court has the right, under the law as it now stands, to order remittiturs, adjust remittiturs, accept the verdict of the jury or the remittitur made by the Trial Court, but we think it is a proper judicial position for an appellate court to take, in most of the cases, to approve either the verdict of the jury or the remittitur ordered by the Trial Court, and enter our judgment accordingly. We should be thoroughly satisfied that both were wrong before we should disagree with either the amount of the jury verdict or the remittitur ordered by the Trial Court.

In this case, we feel that the Trial Court came nearer arriving at a proper verdict when he ordered remittitur so as to fix the personal injury damage at $8,500 than did

the jury in returning a verdict of $12,500. The judgment of the Court in so doing is therefore affirmed, the Assignment of Error is overruled, and the costs in this Court will be taxed against the plaintiff below, appellant in this Court, and the surety, Eulyse M. Smith, on his appeal bond.

Judgment will be entered accordingly, with interest on the same from the date the remittitur was ordered.

Carney and Bejach, JJ., concur.