IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 3, 2013 Session

## AUNDREY MEALS EX REL. WILLIAM MEALS v. FORD MOTOR COMPANY

**Appeal by Permission from the Court of Appeals, Western Section
Circuit Court for Shelby County
No. CT00025403      Donna M. Fields, Judge**

---

**No. W2010-01493-SC-R11-CV - Filed August 30, 2013**

---

A six-year-old boy's spine was fractured in a car wreck when the force of the impact caused him to jackknife over his lap seatbelt and pushed the seatbelt into his stomach and against his spine. The child's mother filed suit on his behalf against Ford Motor Company ("Ford"), alleging that the defective design of the seatbelt and Ford's failure to warn of a potential danger caused the child's permanent paralysis and other enhanced injuries. A jury returned a $43.8 million verdict for compensatory damages, finding Ford to be 15% at fault and two non-parties 85% at fault. Ford's share of the verdict, based on its degree of fault, was $6,570,000. The jury awarded no punitive damages. Ford moved for a new trial, arguing that the verdict was excessive. The trial court denied the motion for new trial and affirmed the verdict in its capacity as thirteenth juror. The Court of Appeals, in a divided opinion, ruled that the verdict was excessive and remanded to the trial court with a suggestion of remittitur from $43.8 million to $12.9 million, a 70.55% reduction. The suggested remittitur, if the plaintiff accepted it, would reduce Ford's share of the verdict to $1,935,000. *Meals ex rel. Meals v. Ford Motor Co.*, No. W2010-01493-COA-R3-CV, 2012 WL 1264454, at *18-21 (Tenn. Ct. App. Apr. 13, 2012). We hold that the Court of Appeals had the authority to suggest a remittitur even though Ford did not request a remittitur. We further hold that the Court of Appeals erred in remitting the verdict to $12.9 million. Having taken the strongest legitimate view of all the material evidence in favor of the verdict, assuming the truth of all that supports it, allowing all reasonable inferences, and discarding any to the contrary, we hold that the jury's verdict was supported by material evidence and was within the range of reasonableness. The judgment of the Court of Appeals is reversed and the jury's verdict is reinstated.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Case Remanded to the Circuit Court**

SHARON G. LEE, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and JANICE M. HOLDER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

J. Houston Gordon and Amber Nicole Griffin Shaw, Covington, Tennessee, for the appellant, Aundrey Meals, as Natural Parent, Guardian, and Next Friend of William Meals.

Lawrence C. Mann, Troy, Michigan (at trial); Sandra Giannone Ezell and Michelle B. Scarponi, Richmond, Virginia (at trial); John Randolph Bibb, Jr. and Ryan Nelson Clark, Nashville, Tennessee (at trial and on appeal); Robert Francis Chapski, Nashville, Tennessee (on appeal); and Christopher T. Handman and Sean M. Marotta, Washington, D.C. (on appeal), for the appellee, Ford Motor Company.

**OPINION**

**I.**

Around 6:30 p.m. on January 18, 2002 in Memphis, Tennessee, six-year-old William ("Billy") Meals was riding with his father and grandfather to visit a family member in the hospital. Billy's grandfather was driving his 1995 Mercury Grand Marquis, which was manufactured by Ford. Billy's father was seated in the front passenger seat, and Billy was seated in the back seat behind his grandfather. Billy's father had buckled him into the back seat, using the vehicle's three-point restraint system that included both a lap and a shoulder strap. Because the shoulder strap ran directly across Billy's face, his father placed the shoulder strap behind Billy's back, leaving him restrained only by the lap seatbelt.

As the Meals family was traveling down Covington Pike, Memphis Police Department Officer Bridgette King observed a vehicle moving at a high rate of speed on Raleigh LaGrange Road. Officer King turned on her cruiser's blue lights and began following the vehicle. The vehicle's operator, John Harris, was driving under the influence of alcohol and cocaine. After turning onto Covington Pike and crossing the median into oncoming traffic, the Harris vehicle collided head-on with the Meals vehicle. The violent impact killed Billy's father and grandfather, and Mr. Harris. Billy, the sole survivor, was seriously injured when he jackknifed over the lap seatbelt. His upper torso was thrust forward, but his lower body was stopped by the seatbelt. The force of the collision caused the lap seatbelt to move up across his stomach, propel into his body, and damage his spine. Emergency medical responders removed Billy from the vehicle and took him to LeBonheur Children's Medical Center.

The seatbelt fractured Billy's lumbar spine and caused serious internal injuries. Billy's injuries included a closed head injury, a fractured and dislocated second lumbar vertebra, a collapsed lung, internal bleeding, injuries to the abdominal wall and small intestine, bruises, and abrasions. He was hospitalized for fifty-four days and underwent numerous medical and surgical procedures. Billy was paralyzed from the waist down and for a period of time, needed a ventilator to support his breathing. About two-thirds of his small intestine had no blood supply, and a significant portion had to be removed and the bowel resectioned. Two surgeries were required to drain blood from his abdomen and remove necrotic tissue. A large abscess in his abdomen had to be drained. He underwent a cystoscopy to evacuate bladder sediment. He had multiple infections with high fevers and required intravenous antibiotics. After his discharge from the hospital, he was transferred to the Scottish Rite Pediatric Hospital in Atlanta, Georgia, for rehabilitation. He spent twenty-five days in the rehabilitation facility and then returned home. He was subsequently hospitalized on several occasions for surgeries to remove kidney stones and to receive treatment for a scrotal abscess and urinary tract infections. He also had to undergo a surgical spinal fusion, which required the placement of rods, screws, and wires to straighten his back.

On January 15, 2003, Aundrey Meals ("Plaintiff") filed suit on behalf of her son against Ford and other defendants in the Circuit Court for Shelby County.[1] As to Ford, Plaintiff alleged negligence, comparative fault, gross negligence, misrepresentation, breach of express and implied warranties of merchantability and fitness for a particular purpose, and strict liability. Plaintiff sought compensatory and punitive damages. When the case went to trial, Ford was the sole defendant.[2]

The trial began on September 28, 2009, and lasted approximately seven weeks. After closing arguments, the jury deliberated for three days and returned a verdict in Plaintiff's favor, concluding that Ford was 15% at fault; Mr. Harris, a non-party, 70% at fault; and Billy's deceased father, a non-party, 15% at fault. The jury awarded Plaintiff $43.8 million in compensatory damages. No punitive damages were awarded. The amount of the verdict attributable to Ford, based on the jury's allocation of fault, was $6,570,000.

---

[1] Plaintiff sued the City of Memphis; Walter Crews, individually and in his capacity as director of the City of Memphis Police Department; Officer King, individually and in her capacity as an officer for the City of Memphis Police Department; and Ford.

[2] On February 7, 2003, the defendants filed a notice of removal to federal court pursuant to 28 U.S.C. §§ 1441 and 1446 (2000). After the United States District Court for the Western District of Tennessee dismissed the federal claims against Mr. Crews and Officer King, the case was remanded to state court. Plaintiff filed an amended complaint asserting claims against the City of Memphis and Ford. The City of Memphis was voluntarily dismissed with prejudice, leaving Ford as the sole defendant.

In its motion for new trial, Ford argued, among other things, that the verdict was excessive, the result of passion, prejudice, or bias, and not supported by material evidence. Ford did not seek a remittitur, arguing that the necessary remittitur to bring the verdict within a reasonable range would destroy the verdict. The trial court denied the motion for new trial and approved the jury's verdict as thirteenth juror.

In the Court of Appeals, Ford argued that the verdict was excessive and asked the court to order a new trial, but did not request a remittitur. In a split decision, the court ruled that the verdict was excessive and remitted the verdict by 70.55%, reducing the total award to $12.9 million and Ford's liability to $1,935,000. *Meals ex rel. Meals v. Ford Motor Co.*, No. W2010-01493-COA-R3-CV, 2012 WL 1264454, at \*21 (Tenn. Ct. App. Apr. 13, 2012). The majority explained that the non-economic damages awarded were reduced to "$8.6 million, an amount that is approximately equal to twice the proven quantifiable economic damages." *Id.*

We granted Plaintiff's application for permission to appeal to review the remittitur suggested by the Court of Appeals and the reasonableness of the jury's award of damages.

## II.

### *A.*

We entrust the responsibility of resolving questions of disputed fact, including the assessment of damages, to the jury. Tenn. Const. art. I, § 6; *Spence v. Allstate Ins. Co.*, 883 S.W.2d 586, 594 (Tenn. 1994); *Wolfe v. Vaughn*, 177 Tenn. 678, 688, 152 S.W.2d 631, 635 (1941). An award of damages, which is intended to make a plaintiff whole, compensates the plaintiff for damage or injury caused by a defendant's wrongful conduct. *Inland Container Corp. v. March*, 529 S.W.2d 43, 44 (Tenn. 1975). A plaintiff may be compensated for any economic or pecuniary losses that naturally result from the defendant's wrongful conduct. *Id*. Economic damages include out-of-pocket medical expenses,[3] future medical expenses,[4] lost wages,[5] and lost earning potential.[6] The plaintiff bears the burden of proving

---

[3] *See* Tenn. Code Ann. § 24-5-113 (2009); *Borner v. Autry*, 284 S.W.3d 216, 218 (Tenn. 2009).

[4] *See Mercer*, 134 S.W.3d at 131-32 (citing *Newman v. Aluminum Co. of Am.*, 643 S.W.2d 109, 111 (Tenn. Ct. App. 1982)).

[5] *See Health Cost Controls, Inc. v. Gifford*, 239 S.W.3d 728, 733 (Tenn. 2007).

[6] *See Mercer*, 134 S.W.3d at 131-32 (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn.
(continued...)

damages to such a degree that, while perhaps not mathematically precise, will allow the jury to make a reasoned assessment of the plaintiff's injury and loss. *Provident Life & Accident Ins. Co. v. Globe Indem. Co.*, 156 Tenn. 571, 576-77, 3 S.W.2d 1057, 1058 (1928); *Overstreet*, 4 S.W.3d at 703.

A plaintiff is also entitled to recover compensatory damages for non-economic loss or injury. *Elliott v. Cobb*, 320 S.W.3d 246, 247 (Tenn. 2010). "Non-economic damages include pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life." *Id.* at 248 n.1 (quoting *Overstreet*, 4 S.W.3d at 715). Damages for pain and suffering are awarded for the physical and mental suffering that accompany an injury. *Overstreet*, 4 S.W.3d at 715. Damages awarded for loss of enjoyment of life are intended to compensate a plaintiff for the impairment of the ability to enjoy the normal pleasures of living. *Lang v. Nissan N. Am., Inc.*, 170 S.W.3d 564, 571-72 (Tenn. 2005). Assigning a compensable, monetary value to non-economic damages can be difficult. *See Wolfe*, 177 Tenn. at 688, 152 S.W.2d at 635 (citing *Power Packing Co. v. Borum*, 8 Tenn. App. 162 (1928)). The assessment of non-economic damages is not an exact science, nor is there a precise mathematical formula to apply in determining the amount of damages an injured party has incurred. *See McCullough v. Johnson Freight Lines, Inc.*, 202 Tenn. 596, 606, 308 S.W.2d 387, 392 (1957); *S. Ry. Co. v. Sloan*, 56 Tenn. App. 380, 392, 407 S.W.2d 205, 211 (1965). Thus, a plaintiff is generally not required to prove the monetary value of non-economic damages. *Health Cost Controls*, 239 S.W.3d at 733 (citing 22 Am. Jur. 2d *Damages* § 200 (2007)).

The trial judge, charged with ensuring a fair trial, serves as an important check on a jury's discretion to award damages.[7] One way the trial judge does this is by serving as the thirteenth juror. *Holden v. Rannick*, 682 S.W.2d 903, 904-05 (Tenn. 1984) (quoting *Cumberland Tel. & Tel. Co. v. Smithwick*, 112 Tenn. 463, 469, 79 S.W. 803, 804 (1904)). As thirteenth juror, the trial judge must independently weigh and review the evidence presented

---

[6](...continued)
Ct. App. 1999)).

[7] Trial judges have broad discretion in controlling the course and conduct of a trial, *see State v. Caughron*, 855 S.W.2d 526, 541 (Tenn. 1993); overseeing the jury selection process, *see State v. Poe*, 755 S.W.2d 41, 45 (Tenn. 1988); making determinations regarding the admissibility of evidence, *see Shipley v. Williams*, 350 S.W.3d 527, 551 (Tenn. 2011); and controlling the scope and manner of examination of witnesses, *see Coffee v. State*, 188 Tenn. 1, 3, 216 S.W.2d 702, 703 (1948). The trial judge also guides the jury through the decision-making process by instructing the jury regarding the law and the particular issues it must determine. *See Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 699 (Tenn. 2011). Jurors are presumed to have followed the trial judge's instructions unless there is evidence to the contrary. *See Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 374 (Tenn. 2006) (citing *State v. Reid*, 164 S.W.3d 286, 346 (Tenn. 2005)).

at trial to determine whether it preponderates in favor of the verdict and decide whether he or she agrees with and is satisfied with the jury's verdict. *See State v. Moats*, 906 S.W.2d 431, 433 (Tenn. 1995). No verdict is valid unless approved by the trial judge acting as the thirteenth juror. *See id.* at 434; *Shivers v. Ramsey*, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996).

Generally, if the trial judge is not satisfied with the jury's verdict, the judge must set aside the verdict and order a new trial. *Jones v. Idles*, 114 S.W.3d 911, 914-15 (Tenn. 2003). If the trial judge's dissatisfaction, however, is based only upon the jury's award of damages, the trial judge may suggest a remittitur, which, if accepted by the plaintiff, would reduce the award to an amount the judge deems appropriate. *See Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997).[8] Tennessee Code Annotated section 20-10-102(a) (2009) authorizes the trial judge to suggest a remittitur:

> In all jury trials had in civil actions, after the verdict has been rendered and on motion for a new trial, *when the trial judge is of the opinion that the verdict in favor of a party should be reduced and a remittitur is suggested by the trial judge on that account*, with the proviso that in case the party in whose favor the verdict has been rendered refuses to make the remittitur, a new trial will be awarded, the party in whose favor such verdict has been rendered may make such remittitur under protest, and appeal from the action of the trial judge to the [C]ourt of [A]ppeals.

(Emphasis added). Due to concerns of cost and efficiency, we have encouraged trial courts to cure excessive verdicts, whenever feasible, through the practice of remittitur, rather than by ordering a new trial. *See Thrailkill v. Patterson*, 879 S.W.2d 836, 840 (Tenn. 1994); *see also Foster*, 621 S.W.2d at 148 ("[R]emittiturs were designed to correct the excessiveness . . . of a jury's verdict as an alternative to the granting of a new trial."). A request for

---

[8] The trial court's authority to suggest a remittitur of a jury's verdict rather than grant a new trial when it disagrees solely with the award of damages is not absolute. A suggested remittitur should not be so substantial as to destroy the jury's verdict. *See Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 148 (Tenn. 1981). There is no set percentage that represents the destruction of the jury's verdict. *See id.* at 148 n.9 ("[W]e do not intend to establish a numerical standard for reviewing additurs and remittiturs."); *Webb v. Canada*, No. E2006-01701-COA-R3-CV, 2007 WL 1519536, at *4 (Tenn. Ct. App. May 25, 2007) ("While we decline to establish any particular percentage that would indicate a remittitur that has totally destroyed a jury verdict, we note that [large] remittiturs by percentage have been found acceptable by this Court and the Supreme Court of our state."). *Compare Webb*, 2007 WL 1519536, at *4 (citing cases in which remittiturs ranging from 40% to 59% were found to not destroy the jury's verdict), *with Guess v. Maury*, 726 S.W.2d 906, 913 (Tenn. Ct. App. 1986) (holding that 75% remittitur destroyed the verdict), *overruled on other grounds by Elliott*, 320 S.W.3d at 252, *and Myers v. Myers*, No. E2004-02135-COA-R3-CV, 2005 WL 1521952, at *1 (Tenn. Ct. App. June 27, 2005) (holding that 70% remittitur destroyed the verdict).

remittitur is implicit in a motion for a new trial and is a valid alternative to a new trial. *See Foster*, 621 S.W.2d at 143-44, 147.

Trial judges may suggest adjustments to a jury's verdict even if the verdict is within the range of reasonableness. *Foster*, 261 S.W.2d at 147. The range of reasonableness is determined by establishing the upper and lower limits of an award of damages that can be supported by material proof. *Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 126-27 (Tenn. 1980). To determine whether a verdict is within the range of reasonableness, the trial judge must consider the credible proof at trial regarding the nature and extent of the injuries, pain and suffering, economic losses including past and future medical bills, lost wages and loss of earning capacity, age, and life expectancy. *See Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 212 (Tenn. Ct. App. 2008). "When remittitur is the issue in a personal injury . . . case, the question is whether the amount of money awarded is excessive, which requires ascertainment of a figure that represents the point at which excessiveness begins." *Ellis*, 603 S.W.2d at 126. This will establish the upper limit of the range of reasonableness. An excessive verdict may be cured by remitting the sum by which the award exceeds that figure. *Id.* The trial court may consider the amount awarded in similar cases in determining whether a verdict is excessive. *See S. Ry. Co.*, 56 Tenn. App. at 392-93, 407 S.W.2d at 211. When the trial judge suggests a remittitur, the plaintiff has three options: accept the remittitur, refuse the remittitur and opt for a new trial, or accept the remittitur under protest and seek relief from the Court of Appeals. *See* Tenn. Code Ann. § 20-10-102(a).

The appellate court's standard of review depends on whether the trial judge suggested a remittitur or affirmed the verdict in his or her role as thirteenth juror. Where the trial court has suggested a remittitur,

> [t]he [C]ourt of [A]ppeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in [Tennessee Rule of Appellate Procedure] 13(d)[9] applicable to decisions of the trial court sitting without a jury. If, in the opinion of the [C]ourt of [A]ppeals, the verdict of the jury should not have been reduced, but the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and judgment

---

[9] Tennessee Rule of Appellate Procedure 13(d) provides:

Findings of Fact in Civil Actions—Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict.

shall be rendered in the [C]ourt of [A]ppeals for the full amount originally awarded by the jury in the trial court.

Tenn. Code Ann. § 20-10-102(b). Where the trial court approves the verdict as thirteenth juror, the appellate courts maintain the statutory authority to suggest or require a remittitur on appeal. *See* Tenn. Code Ann. § 20-10-103(a) (2009). Specifically,

> if after the case was tried in the lower court with a jury and no remittitur was suggested by the trial judge, *a remittitur is first suggested or required in the [C]ourt of [A]ppeals*, on penalty of granting a new trial, then . . . the party in whose favor the verdict or judgment has been rendered may make the remittitur under protest in the [C]ourt of [A]ppeals, and take the case, by application for permission to appeal, for review upon that point, to the [S]upreme [C]ourt.

*Id.* § 20-10-103(a) (emphasis added); *see Ellis*, 603 S.W.2d at 129; *Murphy Truck Lines v. Brown*, 203 Tenn. 414, 421-22, 313 S.W.2d 440, 443 (1958).

Where the trial judge has approved the verdict in its role as thirteenth juror—as the trial court did in this case—the Court of Appeals' review of the verdict and its ability to suggest a remittitur is limited to a review of the record to determine whether the verdict is supported by material evidence. *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn. 1980); *see also Thrailkill*, 879 S.W.2d at 841; *Ellis*, 603 S.W.2d at 129. Material evidence is "evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Knoxville Traction Co. v. Brown*, 115 Tenn. 323, 331, 89 S.W. 319, 321 (1905). An appellate court is required to take "the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and to discard all countervailing evidence." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 501-02 (Tenn. 2012) (quoting *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 833 (Tenn. 2010)). The material evidence analysis is very deferential to the award by the jury and the judgment of the trial court when it affirms the verdict as the thirteenth juror. *See Ellis*, 603 S.W.2d at 129 ("[W]hen the trial judge has approved the verdict, the review in the Court of Appeals is subject to the rule that if there is *any* material evidence to support the award, it should not be disturbed." (emphasis added)). "It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review." *Hohenberg Bros. Co. v. Mo. Pac. R.R. Co.*, 586 S.W.2d 117, 119-20 (Tenn. Ct. App. 1979). "It is simply a search of the record to ascertain if material evidence is present to support the verdict." *Id.* Because the material evidence standard lies at the foundation of the right to trial by jury, if there is material

evidence to support a jury verdict, the appellate courts must affirm it. *See* Tenn. Const. art. I, § 6; *Truan v. Smith*, 578 S.W.2d 73, 74 (Tenn. 1979) (quoting *D. M. Rose & Co. v. Snyder*, 185 Tenn. 499, 508, 206 S.W.2d 897, 901 (1947)); *Crabtree Masonry Co.*, 575 S.W.2d at 5; *City of Chattanooga v. Ballew*, 49 Tenn. App. 310, 316-17, 354 S.W.2d 806, 808-09 (1961); *see also Grandstaff v. Hawks*, 36 S.W.3d 482, 497 (Tenn. Ct. App. 2000) ("We have a duty to uphold a jury's verdict whenever possible.").

The Court of Appeals' authority to suggest a remittitur when the trial court has affirmed the verdict is far more circumscribed than that of the trial court. *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 331 & n.2 (Tenn. 1996); *see also Ellis*, 603 S.W.2d at 129. If the Court of Appeals suggests a remittitur, the plaintiff may either accept the remitted amount, opt for a new trial, or accept the remitted amount under protest and apply to this Court for permission to appeal. Tenn. Code Ann. § 20-10-103(a).

*B.*

In this case, the Court of Appeals reduced the jury's award of damages by 70.55% based on its conclusion that the award of non-economic damages of $39.5 million demonstrated sympathy and was excessive. The Court of Appeals reached this conclusion without discussing the evidence regarding Plaintiff's damages and by relying on the amount of the verdict in *Potter v. Ford Motor Co.*, 213 S.W.3d 264 (Tenn. Ct. App. 2006). We respectfully disagree with the conclusion reached by the Court of Appeals.

In our review of the material evidence supporting the award of compensatory damages, we first consider the nature and extent of Billy's injuries. It is not disputed that he suffered a serious, life-altering, permanent injury.[10] He had a fractured and dislocated lumbar vertebra, which caused him to be permanently paralyzed from the waist down. He sustained a closed head injury, a collapsed lung, internal bleeding, and severe abdominal and intestinal injuries. He spent fifty-four days in the hospital and underwent a number of surgical procedures, including surgery to remove a significant portion of his small intestine and resection the bowel, surgeries to drain blood from the abdomen and remove necrotic tissue, and a cystoscopy to evacuate bladder sediment. He developed an abdominal abscess which had to be drained and had multiple infections which required the administration of antibiotics. He spent twenty-five days in a rehabilitation center learning how to adapt to his impairment and receiving physical therapy.

---

[10] During opening statements, Ford's counsel stated to the jury that the seriousness and extent of Billy's injuries were not contested. Ford offered no proof as to damages, and instead, focused on liability issues.

After his discharge from the hospital and rehabilitation center, Billy's medical issues and treatment did not end. To treat his condition of progressive kyphosis, he had to have rods, screws, and wires surgically installed in his back and a spinal fusion performed. His paraplegia causes him to suffer from pressure sores, which on occasion become infected and require medical treatment. He requires physical therapy to protect against contractures in his ankles, knees, and hips. He suffers from atrophy in his legs, and his toes are misshapened and claw-like. He occasionally suffers from kidney stones; he has had to undergo two surgeries to remove kidney stones. He sometimes gets burned or cut, but cannot feel the pain associated with the injuries and does not know he needs to seek treatment. As he ages, his shoulders and wrists will require medical treatment due to overuse. He also has a weakened immune system and is therefore more susceptible to illness and slower to recover.

Likewise, there is no question that Billy has experienced a significant amount of mental and physical pain and suffering as a result of these serious injuries. He was conscious when emergency workers arrived at the wreck scene, removed him from the vehicle, and rushed him to the hospital. While he was hospitalized, he complained of pain, cried, moaned, and was restless and irritable. He became withdrawn and depressed. He did not socialize as he once did. He would have outbursts "over the littlest things" and be angry with his mother.

Plaintiff's economic damages totaled approximately $4.3 million. Medical bills incurred were $552,920.28. Future medical bills were calculated, when reduced to present day value, as being between $1,300,000 and $1,479,340.80. Lost earning capacity, when reduced to present day value, was determined to be $1,429,000, if Billy entered the workforce with a high school diploma, or $2,262,789, if he received a college degree.

The next element of damages to be considered is the impact of Billy's injuries on his enjoyment of life. The impact is clearly substantial. Before the wreck, he was a happy, active, normal six-year-old boy who enjoyed playing outside and going fishing. He was a good student and an all-star baseball player; he enjoyed school and his friends. After the wreck, he was paralyzed from the waist down and confined to a wheelchair, without the ability to ever run, walk, or play baseball again. He has no control over his bowel or bladder. He must use a catheter in order to urinate and experiences frequent urinary tract infections. His bowel regimen takes up to an hour a day and requires a suppository and manual stimulation. He is likely impotent and his sexual functioning impaired. Following the wreck, he was not able to finish the school year and had to repeat the first grade. His grades dropped and he had little interest in his studies. He has received psychiatric treatment and will likely need more counseling in the future to assist with the emotional issues caused by his paralysis. As a testament to his determination and resilience, and with the support of his mother and medical professionals, Billy has gradually adapted to his impaired

condition. The Meals family moved to Murfreesboro, Tennessee, so that they could be closer to family members and so that Billy could have access to more opportunities. He enjoys participating in a wheelchair basketball league.

Billy, who was six years old at the time of the wreck, was fourteen years old at the time of trial and had a life expectancy of 55.79 years.

Our review of the evidence leads us to the conclusion that Plaintiff is entitled to a substantial award of damages. Billy suffered a catastrophic injury and will never recover the ability to walk or engage in the activities he participated in prior to the wreck. He spent fifty-four days in the hospital and twenty-five days in a rehabilitation facility. He underwent numerous surgical procedures, including removal and resection of part of his small intestine and a spinal fusion with the insertion of rods and screws. He has had frequent urinary tract infections and other conditions that required medical attention and the administration of antibiotics. He will continue to have medical problems and require medical treatment. He no longer has control over his bowel or bladder. Much of his small intestine has been removed. He will likely never father a child or have normal sexual functioning. His economic damages, including past medical bills, future medical bills, and lost earning capacity total $4.3 million. Non-economic damages, including pain and suffering, permanent impairment or disfigurement, and loss of enjoyment of life, past and future, are not as easy to determine. The jury returned a general verdict of $43.8 million in damages.[11] Because this was a general verdict, with no apportionment between economic and non-economic

---

[11] In closing argument, Plaintiff's counsel did not ask for a specific amount, but itemized the economic damages and reiterated the ways in which Billy was affected by the wreck. Plaintiff's counsel argued that Ford paid one of its expert witnesses $1,110.75 per day for her work, suggesting that Billy's remaining days were worth just as much. For his life expectancy of 20,363.35 days, this would total $22,618,591.01. Counsel for Ford, however, took an "all-or-nothing" approach and gave the jury little direction in assessing damages, arguing in closing:

> Now, I don't believe that you will get to this question with regard to damages. It's Question Number 6 [on the verdict form]. It's on Page 3. But if you do, *I have nothing to say*. We have never in this case questioned that Billy is hurt and that he has limitations in his life that are tragic and that should never have happened to him as a result of John Harris running like an idiot into his family on the day of this accident. We have never questioned that.

> So if you get to this, you have the information about how he is hurt. And you have heard from [a witness] about how people with limitations also have opportunities. You have all that information. *I have nothing else to say about it.*

(Emphasis added).

damages, we can only presume that the jury awarded the Plaintiff $39.5 million in non-economic damages.[12]

A jury has wide latitude in assessing non-economic damages. We trust jurors to use their personal experiences and sensibilities to value the intangible harms such as pain, suffering, and the inability to engage in normal activities. This task is made more difficult in a catastrophic injury case. It is not our role to second-guess the jury and to substitute our judgment; but it is our role to protect against a verdict that is excessive. *See Coffey*, 929 S.W.2d at 330-31 & n.1; *see also Foster*, 621 S.W.2d at 143 & n.2, 147. When determining whether a damage award is excessive and should be reduced, we carefully review the material evidence supporting the damage award. *See Ellis*, 603 S.W.2d at 126-27. In addition, we can look to verdicts in similar cases. *Id.* at 129 (quoting *S. Ry. Co.*, 56 Tenn. App. at 392-93, 407 S.W.2d at 211). Our review of verdicts in similar cases must be approached with some caution. First, we recognize that by reviewing verdicts in published opinions, we are not reviewing the entire pool of damage awards. Cases resolved by settlement and/or mediation are not included in the pool of damage awards, and their absence can skew the results. Second, we must take care to only consider cases that are "similar"—presumably involving a similar plaintiff with similar injuries. Third, courts should take inflation and the reduced value of the dollar into account when considering these verdicts. *See S. Ry. Co.*, 56 Tenn. App. at 392-93, 407 S.W.2d at 211. Finally, courts should be mindful that when looking at other jury verdicts, each case must be judged on its own particular facts. *See Ellis*, 603 S.W.2d at 129 (quoting *S. Ry. Co.*, 56 Tenn. App. at 392-93, 407 S.W.2d at 211); *Stark*, 47 Tenn. App. at 37, 334 S.W.2d at 958.

The Court of Appeals relied on *Potter*, 213 S.W.3d 264, as a similar case to support its decision to suggest a remittitur; however, we do not find *Potter* to be similar. In *Potter*, a forty-two-year-old woman's vehicle slid off a wet roadway and struck a tree. She sustained a spinal fracture when her seat-back collapsed, and she was paralyzed from the waist down. The jury returned a $10 million verdict, finding the automobile manufacturer to be 70% at fault. The issue on appeal was liability, not damages. *See Potter*, 213 S.W.3d at 266-67. There was no discussion in *Potter* as to the amount of economic or non-economic damages, nor of the forty-two-year-old plaintiff's life expectancy, which we presume was much shorter than Billy's life expectancy.

---

[12] Effective October 1, 2011, the Tennessee Civil Justice Act of 2011, Tennessee Code Annotated section 29-39-101 to -104 (2012), limits recovery of non-economic damages in a civil suit where the injury or loss is catastrophic in nature—including a spinal cord injury resulting in paraplegia or quadriplegia, *see id.* § 29-39-102(c)—to $1 million, *id.* § 29-39-102(c).

Ford cites to other Tennessee cases involving lower jury verdicts. In *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 525, 527 (Tenn. 2008), a jury awarded a $5 million verdict for the wrongful death of an infant. But a wrongful death case involves different elements of damages, and is therefore not comparable.[13] Moreover, the amount of compensatory damages was not challenged on appeal and there is no discussion of the evidence which supported the award.

In *Palanki ex rel. Palanki v. Vanderbilt University*, 215 S.W.3d 380, 384 (Tenn. Ct. App. 2006), a jury awarded a $16.4 million verdict in a case where a doctor negligently removed 90% of a child's bladder. The trial judge suggested a remittitur to $6.5 million, which was accepted under protest and appealed. *Id.* The Court of Appeals applied a preponderance of the evidence standard and affirmed the trial court's suggestion of remittitur. *Id.* at 386-87. *Palanki* did not involve a spinal cord injury. Although the child was unable to urinate on his own and had to self-catheterize, his injury did not limit his ability to engage in normal life activities, have friends, get married, have a normal sex life, father children, receive an education, or earn a living. *Id.* at 389. The child's economic damages totaled approximately $417,000, *id.* at 387, whereas Billy's economic damages totaled $4.3 million. In addition, Billy's injuries had a much greater impact on his daily activities and prospects for the future. *Palanki* also involved the trial court's suggestion of remittitur, *id.* at 385, which presents a different standard of review for the appellate courts than a case where the trial court affirmed the verdict as the thirteenth juror. *See* Tenn. Code Ann. § 20-10-102(b).

In *Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178 (Tenn. Ct. App. 2008), a fifty-year-old woman who suffered second and third-degree burns and an inhalation injury after her vehicle left the roadway and caught fire was awarded a $3 million verdict against the vehicle manufacturer. The trial judge suggested remitting the verdict to $2 million based on the facts that the plaintiff's medical bills were only $41,456.86, yet she was awarded $200,000 in medical expenses, and that the plaintiff had only sued for $2 million, yet was awarded $3 million. *Id.* at 209. The Court of Appeals ruled that the reduced verdict was supported by material evidence and affirmed the suggestion of remittitur. *Id.* at 211-12. The court explained that "whether [it] would have awarded [the plaintiff] $1,958,543.14 in non-

---

[13] Wrongful death in Tennessee is a statutorily-created cause of action that both preserves any action belonging to the decedent and creates a separate action that belongs to the decedent's next-of-kin to compensate them for incidental damages suffered as a result of the decedent's death. Tenn. Code Ann. §§ 20-5-101 to -120 (2009 & Supp. 2012); *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 597-98 (Tenn. 1999). These damages include mental and physical suffering, loss of time and actual expenses resulting from the injury, damages the survivors experienced resulting from the injury, the pecuniary value of the decedent's life, and loss of spousal and parental consortium. Tenn. Code Ann. § 20-5-113; *Hunter v. Ura*, 163 S.W.3d 686, 705 (Tenn. 2005); *Jordan,* 984 S.W.2d at 600-01.

economic damages is not the point. The assessment of these subjective damages was for the jury to decide in the first instance and then for the trial judge." *Id.* The court also noted that the remitted verdict consisted of $1,958,543.14 in non-economic damages, which was not unreasonable given that the plaintiff's lung condition and decreased lung capacity interfered with her ability to work and engage in regular daily activities and would continue for the rest of her life expectancy of twenty-seven years. *Id.* A lung injury, while serious, is not similar to a spinal cord injury resulting in paraplegia.

Ford also cited to cases from other jurisdictions in support of its argument that the verdict in this case is excessive. Only two of these cases involve a spinal cord injury. In *Auer ex rel. Auer v. New York*, 733 N.Y.S.2d 784, 785-86 (N.Y. App. Div. 2001), an eighteen-year-old woman, paralyzed in a car wreck, was awarded $18,952,486 in compensatory damages. The appellate court increased the award for pain and suffering to $1.5 million for a total award of $20,456,486. *Id.* at 787-88. In *Simon v. American Crescent Elevator Co.*, 767 So. 2d 64, 67 (La. Ct. App. 2000), a man, rendered a paraplegic after he was injured at work, was awarded $6.4 million for pain and suffering, $1 million for medical and rehabilitation expenses, and $1.2 million of lost wages—totaling $8.6 million in compensatory damages. Additionally, his wife was awarded $900,000 and each of his five children was awarded $250,000 for loss of consortium. *Id.* The trial court denied the defendant's motion for remittitur, *id.* at 68, and the appellate court affirmed the awards of damages, *id.* at 75.

Our research reveals other cases that involved spinal cord injuries and resulted in substantial verdicts. *See, e.g.*, *Gutierrez ex rel. Gutierrez v. United States*, 323 F. App'x 493, 493-94 (9th Cir. 2009) (awarding $31 million in non-economic damages to a four-year-old child who was rendered a quadriplegic as a result of a car wreck); *Foradori v. Harris*, 523 F.3d 477, 481, 484-85, 501 (5th Cir. 2008) (awarding a verdict of $20,881,884.41 to a fifteen-year-old boy with a life expectancy of fifty-three years who became a quadriplegic after sustaining injuries during an altercation); *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 438, 454 (S.D.N.Y. 2008) (suggesting a reduction of a compensatory damages award from $44,706,444 to $30,471,710 for a man who was paralyzed after an on-the-job injury and had a life expectancy of thirty-nine years); *Karlsson v. Ford Motor Co.*, 45 Cal. Rptr. 3d 265, 268-69 (Ct. App. 2006) (awarding $30.45 million in compensatory damages to a five-year-old boy who sustained a spinal cord injury during a car wreck and the parties stipulated to reduce the total verdict to $30,341,636.50 based on findings of comparative fault); *Toe v. Cooper Tire & Rubber Co.*, No. 11-1588, 2013 WL 1749739, at *3 (Iowa Ct. App. Apr. 24, 2013) (awarding $28.4 million in compensatory damages to a woman who was paralyzed due to injuries sustained in a car wreck).

After carefully reviewing the evidence in the light most favorable to Plaintiff, assuming the truth of all that supports it, allowing all reasonable inferences and discarding any inferences to the contrary, affording all due respect for the life-changing injuries Billy suffered, and considering verdicts in similar cases, we conclude that this verdict was supported by material evidence and is within the range of reasonableness. We recognize, however, that the amount of this verdict rests at the high end of the range of reasonableness but is not excessive. This amount reflects an award of $4.3 million in economic damages and $39.5 million in non-economic damages for a young man who, at the age of six, sustained catastrophic injuries and has a life expectancy of 55.79 years. The Court of Appeals erred in its analysis of the material evidence and its reliance on *Potter*. We therefore reverse the judgment of the Court of Appeals and reinstate the jury's verdict.

## Conclusion

The judgment of the Court of Appeals is reversed and the jury's verdict of $43.8 million is reinstated, with Ford's share of the verdict being $6,570,000. The case is remanded to the Circuit Court for Shelby County for further proceedings as necessary. Costs of this appeal are taxed to Ford Motor Company and its surety, execution for which may issue if necessary.

_____
SHARON G. LEE, JUSTICE

-15-