IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 22, 2014 Session

## AUDREY BONNER, ET AL. V. DEAN DEYO, ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT00096112      Donna M. Fields, Judge**

_____

**No. W2014-00763-COA-R3-CV - Filed December 5, 2014**

_____

This appeal results from the trial court's suggestion of additur to a jury verdict stemming from an automobile accident. Plaintiff sued for damage to her vehicle and physical injuries sustained when she was rear-ended by one of the defendants. Plaintiff's husband also asserted a loss of consortium claim. The plaintiffs sued both the driver of the vehicle and the vehicle's owner, also husband and wife. As the matter of liability was stipulated, the only issues submitted to the jury was the amount of damages, if any, suffered by the plaintiffs. The jury returned a verdict awarding plaintiff $3,577.00 for her medical expenses, but declined to award the plaintiffs any damages claimed for other injuries, including any pain and suffering, loss of enjoyment of life, or loss of consortium. The trial court suggested an additur of $10,000.00 to the jury verdict. Defendants accepted the additur under protest and timely appealed to this Court. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which ANDY D. BENNETT, J., and DAVID R. FARMER, SP. J., joined.

Eric J. Plumley, Memphis, Tennessee, for the appellants, Dean Deyo and Kathleen Deyo.

Joseph Michael Cook, Germantown, Tennessee, for the appellees, Audrey Bonner and Floyd Bonner, Jr.

**OPINION**

## Background

Plaintiffs Audrey Bonner and Floyd Bonner, Jr., (together, the "Bonners" or "Appellees") filed a complaint on March 2, 2012[1] against Defendants Dean Deyo and wife Kathleen Deyo (together, the "Deyos" or "Appellants") for damages stemming from an automobile accident that occurred on April 21, 2011. According to the Bonners' complaint, Ms. Bonner was driving her vehicle and stopped at a red light. Ms. Bonner, still stopped, was rear-ended by another vehicle driven by one of the defendants, Mr. Deyo. Although Ms. Deyo was not in the vehicle with her husband, she solely owned the vehicle driven by Mr. Deyo and is also a defendant. In the complaint, Ms. Bonner asserted that she sustained physical injuries to her head, neck, and other portions of her body, and that she incurred medical expenses associated with her injuries. Mr. Bonner asserted that Ms. Bonner's injuries caused him to lose the services and society of his wife.

On April 5, 2013, the Deyos filed their answer, denying the material allegations contained therein. Before trial, the parties stipulated to several facts by written agreement filed December 5, 2013. The parties stipulated to the authenticity and admissibility of Ms. Bonner's medical records and her vehicle's repair estimate.[2] Additionally, the parties stipulated to the definitions of several medical terms.

A jury trial was held on December 9 and 10, 2013. The record indicates that the Deyos conceded liability, and that the only issues for the jury to decide involved Ms. Bonner's medical expenses, her damages for pain and suffering and loss of enjoyment of life, and Mr. Bonner's loss of consortium damages.

Ms. Bonner testified at trial. She stated she was fifty-one years old at the time of the accident. Before the accident, she had left work around 5:00 p.m. and was traveling alone in her car on Union Avenue in Memphis. At trial, she recounted the accident:

> As I was driving eastbound on Union, I was approaching the
> intersection of Union and Cooper. I was about four or five car
> lengths behind the light. The light was red. I was stopped at the
> red light, and I was sitting in the car with both hands on the

---

[1]Plaintiffs amended their complaint on March 26, 2013.

[2]Property damage was not at issue during trial. The parties stipulated that the repair estimate would be admitted "for the sole purpose of illustrating the nature and extent of the damage to plaintiffs' vehicle," and that the plaintiffs "are not trying to recover any award for property damages at trial as that issue has been resolved by the parties." The total repair bill for Ms. Bonner's car totaled $5,696.78. Mr. Deyo did not have any repair work done on his vehicle.

steering wheel looking straight ahead. And all of a sudden, I heard - - I mean, all of a sudden I felt a big impact in the back of the car. Mr. Deyo actually rear-ended me unexpectedly in the car. . . There was no indication that he was even approaching me, no. I didn't hear the tires squeal, any rubber burning on the road or anything like that.

Ms. Bonner testified that the accident caused her head to "actually bounce[] back into the headrest of the - - on the seat of the car." According to Ms. Bonner, her airbag did not deploy, and she was unsure whether her car moved forward. She further stated that her head started "throbbing and I felt stiffness in my neck and I also felt dizzy." The police and fire department arrived at the accident scene shortly thereafter and asked Ms. Bonner if she needed an ambulance to take her to the hospital. She declined. However, her husband shortly arrived at the scene, and Ms. Bonner's dizziness continued. He asked her if she needed medical attention. Despite her dizziness and lightheadedness, she declined her husband's offer to take her to the hospital. A tow truck then removed her vehicle from the scene around 7:30 p.m.

When Ms. Bonner's dizziness and lightheadedness did not subside after several hours, she decided around 8:00 p.m. to go to the emergency room. At the hospital, Ms. Bonner said "[t]hey took my vitals, I had an x-ray, and the doctor actually examined me, my neck." She was discharged around 11:00 p.m. with a prescription for two medications, Lortab (a painkiller) and Robaxin (a muscle relaxer). Ms. Bonner testified that she did not fill either prescription because "I just don't like taking medicine. I'm just the type of person that if I'm in some pain, if I have a headache, I just go to sleep." Although she testified that she still felt "sluggish" after the hospital discharged her, she slept that night at her home and went to work the next day. She stated that by the day after the accident her dizziness and the throbbing sensation in her head had subsided. However, she testified that her neck stiffness was still present, even during trial, and that when she turns her head, her neck "pops." Although she said the pain was "not any type of excruciating pain," she stated it was "enough to be annoying" and caused discomfort. She also stated that she had no stiffness, pain, or tenderness until the accident with Mr. Deyo. Ms. Bonner testified that she could "do the things that I've always done, but with some discomfort."

Although she previously had not had any neck pain, Ms. Bonner testified that her hospital x-ray at Saint Francis revealed some "arthritic changes in [her] neck." Her records indicate that she suffered from "cervical spondylosis."[3] However, Ms. Bonner indicated that

---

[3]The parties stipulated to the following definition of "cervical spondylosis": "The general term
(.....continued)

she had never been diagnosed with or sought treatment for a neck or back injury prior to the accident with Mr. Deyo. In July 2011, several months after the accident, Ms. Bonner saw her primary care physician Dr. Michele Neal at a regularly scheduled appointment. She told her physician about the persisting conditions from the accident, and she was referred to orthopedic surgeon Dr. Sam E. Murrell at OrthoMemphis. Ms. Bonner had two appointments with Dr. Murrell, October 17, 2011 and March 26, 2012, both for neck pain. Ms. Bonner's records from OrthoMemphis indicate that Dr. Murrell and Ms. Bonner "discussed a possible anti-inflammatory, but she states she does not want to take any medications." Her reports from OrthoMemphis further state that she was having pain, but also that she had some "degenerative changes," including "degenerative disc disease."[4] Dr. Murrell referred Ms. Bonner to a physical therapy group, Physiotherapy Associates. Her second visit with Dr. Murrell was on March 26, 2012. Dr. Murrell's report from her second visit stated that Ms. Bonner had been attending physical therapy, that she had been taking some over-the-counter anti-inflammatory medication to combat her pain, and that she had "degenerative disc disease cervical spine with neck pain which exacerbated[5] her history after a motor vehicle accident." She was discharged from physical therapy on December 20, 2011, and her records reflect that the pain at that time was a three on a scale of one to ten and that she had reported an 80% improvement in her condition since starting therapy.

Also at trial, both Mr. and Ms. Bonner testified about their relationship. When asked about how their relationship had changed since the accident, Ms. Bonner testified that

> It's basically the same from April to July as it is now. We - - as far as, you know, my husband and I cuddling and me - - him putting his arms around me and holding me close like when we sit on the couch watching TV or we lay on the couch, it's - - my neck is stiff, I can't sit down for long periods of time without

---

(.....continued)

for age-related wear and tear affecting the spinal discs in the neck. As the discs dehydrate and shrink, bone spurs and other signs of osteoarthritis develop. The condition is very common and worsens with age. In most cases, the condition causes no symptoms. When symptoms do occur, they typically affect only the neck causing pain and stiffness."

[4]The parties stipulated to the following definition of "degenerative disc disease": "Nearly everyone shows some signs of wear and tear on the spinal discs as they age, but not everyone will have symptoms described as degenerative disc disease. Not actually a disease, but rather a condition in which pain is caused from a damaged disc. The typical person with this condition is active, otherwise healthy and in his or her 30s or 40s."

[5]The parties stipulated to the following definition of "exacerbation": "An increase in the severity of a condition or in any of its signs or symptoms."

getting up, rolling my neck or even having to just get up and walk around a little bit.

Despite her discomfort, Ms. Bonner testified that her relationship with her husband has remained "strong," and that it did not prevent them from being intimate. Similarly, Mr. Bonner testified that Ms. Bonner's injuries often cause her to get up when they are on the couch or in bed, and that "it changes the - - the dynamics of it all." Mr. Bonner also stated that, although his wife continued her normal activities such as gardening, she would tell him that her neck was stiff or hurting, and sometimes he would notice her moving her neck right to left. Despite any of his wife's discomfort or pain, Mr. Bonner stated that he did not have to take on any additional household responsibilities because of Ms. Bonner's injuries.

The jury also heard testimony from the driver of the vehicle who rear-ended Ms. Bonner, Mr. Deyo. Mr. Deyo recounted the traffic conditions on the day of the accident as "heavy" because it was rush hour, and traffic "[wasn't] moving very fast." According to Mr. Deyo, he was traveling home from work. He stated that as he approached the intersection

[t]he light that I was coming up onto Cooper Avenue was changing from yellow to red. I was in the process of braking for that, for the intersection. We were - - I was probably, I don't know, maybe the fourth or fifth car back. And in the right-hand lane, it was fairly open. And so, it just looked like a good opportunity to change lanes. And so I glanced over my right shoulder into the blind spot to see if there was a car coming to give me an opportunity to change lanes. And when I looked back, the car in front of me had come to a complete stop. And I had my foot on the brake at the time because we were slowing down. And - - but I wasn't able to stop in time and impacted the back of her car.

Mr. Deyo further stated that he was traveling approximately five miles per hour, that he was braking, that his airbag did not deploy, and that there was no broken glass. He suffered no injuries and was not "shaken up." He described the collision as "very low impact" and "just a single jolt." When the fire department arrived on the scene, a fireman volunteered to move Ms. Bonner's car, and according to Mr. Deyo her "right bumper was sort of hanging off of her car and it was going to make - - it was going to drag if they tried to drive it." Accordingly, Mr. Deyo retrieved several bungee cords from his own vehicle to secure Ms. Bonner's bumper. His own vehicle sustained minor damage, including "some scratches on the bumper," and did not require any repair work.

After the close of trial, on December 10, 2013, the jury awarded Ms. Bonner damages in the amount of $3,577.75 for medical expenses and zero damages for any pain and suffering or loss of ability to enjoy life. The jury did not award Mr. Bonner damages for the loss of consortium. The trial court entered the judgment on the jury verdict on December 16, 2013 stating that Ms. Bonner had been awarded total damages of $3,577.00.[6]

Shortly thereafter, on January 14, 2014, the Bonners filed a motion for additur or, in the alternative, for a new trial. In their motion, the Bonners argued, *inter alia*, that the jury verdict was contrary to the weight of the evidence, that the jury's award of zero damages for Ms. Bonner's pain and suffering was inconsistent with the evidence, and that the jury ignored uncontradicted testimony regarding Mr. Bonner's loss of consortium claim. The Deyos responded to the Bonner's motion on February 10, 2014 and argued that the trial court should not disturb the jury verdict. On March 14, 2014, the trial court entered its Suggestion of Additur, stating that the "verdict of the jury in the amount of $3,577.00 is not adequate to compensate the Plaintiffs in compensatory damages and the Court accordingly suggests an additur in the amount of $10,000.00." Upon the Deyos timely acceptance of the additur under protest, the trial court entered its final Judgment and Order of the Court on April 4, 2014, which entered the judgment of $13,577.00 and denied the Bonners' motion for new trial.

The Deyos filed a timely appeal to this Court on April 21, 2014.

## Issue

The Deyos raise one issue for appeal, which we restate: whether the trial court erred by suggesting a $10,000.00 additur for the Bonners' non-economic damages when the jury awarded them zero non-economic damages.[7]

## Analysis

The Tennessee Constitution entrusts the responsibility of resolving questions of disputed fact, including a litigant's damages, to the jury. Tenn. Const. art. I, § 6. Damages awarded by a jury, intended to make a party whole, compensate that party for any suffering,

---

[6]The judgment of the trial court slightly misstates the amount of the verdict as $3,577.00 when the jury verdict form indicates Ms. Bonner's award as $3,577.75.

[7]At trial, Mr. and Mrs. Bonner did not seek any damages for lost wages, lost earning capacity, or property damage. Thus, the jury awarded the Bonners their claimed economic damages for medical expenses. It follows then that the trial judge's suggestion of additur was related to non-economic damages.

injury, or damage caused by a defendant's wrongful conduct. ***Inland Container Corp. v. March***, 529 S.W.2d 43, 44 (Tenn. 1975). "The plaintiff bears the burden of proving damages to such a degree that, while perhaps not mathematically precise, will allow the jury to make a reasoned assessment of the plaintiff's injury and loss." ***Meals ex rel. Meals v. Ford Motor Co.***, 417 S.W.3d 414, 419 (Tenn. 2013) (citing ***Provident Life & Accident Ins. Co. v. Globe Indem. Co.***, 3 S.W.2d 1057, 1058 (Tenn. 1928)).

In his or her role as thirteenth juror, a trial judge is charged with ensuring a fair trial, including overseeing the jury's discretion to award damages. ***Meals***, 417 S.W.3d at 420. "No verdict is valid unless approved by the trial judge acting as the thirteenth juror. ***Id.*** (citing ***State v. Moats***, 906 S.W.2d 431, 434 (Tenn. 1995)); ***Shivers v. Ramsey***, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996). When a trial judge is dissatisfied with the jury's verdict based on his or her finding that the jury's allocation of fault is unsupported by the weight of the evidence, the judge must grant a new trial. ***Jones v. Idles***, 114 S.W.3d 911, 914–15 (Tenn. 2003). However, when the trial judge's dissatisfaction is only with the amount of the jury award, and not with the allocation of liability or fault, he or she may suggest an additur or remittitur. *See* ***Turner v. Jordan***, 957 S.W.2d 815, 824 (Tenn. 1997).

Regarding the additur of a jury verdict, statutory provisions outline the authority of both the trial court and this Court. With respect to the trial court, Tennessee Code Annotated Section 20-10-101 provides, in relevant part, as follows:

> (a)(1) In cases where, in the opinion of the trial judge, a jury verdict is not adequate to compensate the plaintiff or plaintiffs in compensatory damages or punitive damages, the trial judge may suggest an additur in such amount or amounts as the trial judge deems proper to the compensatory or punitive damages awarded by the jury, or both such classes of damages.
>
> * * *
>
> [(b)](2) The court of appeals shall review the action of the trial court suggesting an additur using the standard of review provided in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury. If the court of appeals is of the opinion that the verdict of the jury should not have been increased or that the amount of the additur is improper, but that the judgment of the trial court is correct in all other respects, the case shall be reversed to that extent, and the court of appeals may order remitted all or any part of the additur.

Tennessee Rule of Appellate Procedure 13(d) stated that "review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." However, conclusions of law are not afforded the same presumption. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741, 744–45 (Tenn. 2002).

In ***Long v. Mattingly***, 797 S.W.2d 889 (Tenn. Ct. App. 1990), this Court explained the role of appellate courts in reviewing a trial court's adjustment of a jury verdict:

> The role of the appellate courts is to determine whether the trial court's adjustments were justified, giving due credit to the jury's decision regarding the credibility of the witnesses and due deference to the trial court's prerogatives as thirteenth juror . . . .
>
> The contours of the scope of appellate review have changed over the years. Now, the appellate courts customarily conduct a three-step review of the trial court's adjustment of a jury's damage award. First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. ***Burlison v. Rose***, 701 S.W.2d at 611. Second, we examine the amount of the suggested adjustment since adjustments that "totally destroy" the jury's verdict are impermissible. ***Foster v. Amcon Int'l, Inc.***, 621 S.W.2d at 148; ***Guess v. Maury***, 726 S.W.2d 906, 913 (Tenn. Ct. App. 1986). Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment. *See* Tenn. Code Ann. § 20-10-102(b).[8]

***Long***, 797 S.W.2d at 896. With the foregoing guidelines in mind, we turn to address the substance of the Deyos' appeal.

Our first inquiry is "simply to ascertain whether the trial judge's actions in increasing or decreasing a verdict were justified, giving due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his or her capacity as thirteenth juror." ***Burlison v. Rose***, 701 S.W.2d 609, 611 (Tenn. 1985) (citing ***Foster v. Amcon Int'l,***

---

[8]We recognize that Tennessee Code Annotated Section 20-10-102(b) concerns remittiturs. However, the same standard of review applies to any adjustment of a jury award by a trial judge, including additurs.

***Inc.***, 621 S.W.2d 142, 145 (Tenn. 1981)). While the amount of the verdict is primarily for the jury to determine, the trial judge who presided at the trial and heard the evidence is the next most competent person to pass upon the matter. ***Id.*** (citing ***Transports, Inc. v. Perry***, 414 S.W.2d 1, 5 (Tenn. 1967)). In ***Foster v. Amcon Int'l***, 621 S.W.2d 142 (Tenn. 1981), the Tennessee Supreme Court opined

> It has thus been well established that a verdict of a jury is subject to the supervision of the trial court. The power of a trial judge to disturb a verdict because of his dissatisfaction with the amount of damages rests in this state on more than a century of precedent and practice.

***Foster***, 621 S.W.2d at 144.

However, "adjustments are proper only when the court disagrees with the amount of the verdict." ***Burlison***, 701 S.W.2d at 611. In reaching its decision on the suggestion of additur, the trial court in this case, stated that the

> verdict of the jury in the amount of $3,577.00 is not adequate to compensate the Plaintiffs in compensatory damages and the Court accordingly suggests an additur in the additional amount of $10,000.00 for a total judgment in the amount of $13,577.00 plus the costs of this cause.

Although the trial court's explanation is not lengthy, it is sufficient to meet the first prong because the trial court expressed that it "disagree[d] with the amount of the verdict." ***Burlison***, 701 S.W.2d at 611. In ***Burlison***, the trial judge suggested a remittitur of the jury verdict. The Tennessee Supreme Court held that, although the trial court did not expressly state its disagreement with the verdict, it denied the defendant's motions for judgment notwithstanding the verdict and new trial. ***Id.*** The Court found that the denial of these motions, along with a lack of evidence showing the jury failed to follow instructions, indicated that the trial judge approved the jury's verdict as to the defendant's liability, but disagreed with the jury's monetary award. ***Id.*** "The very purpose of our remittitur procedure is to allow the trial judge to disagree with the amount of the jury's award and suggest a reduction while avoiding the necessity of conducting an entire new trial." ***Id.*** Likewise, in the instant case, the trial judge expressed a disagreement with the jury's valuation of Ms. Bonner's damages. Also important to note, the trial judge in this case did not express any "disagreement with the facts as found by the jury," which according to ***Burlison***, would be an invalid reason for the trial judge to adjust the jury verdict. *See **id.*** Because the trial court satisfied the first prong by its disagreement with the jury verdict, we turn to the next inquiry.

The second inquiry of our review of the trial court's suggestion of additur is whether the suggested judgment amount "totally destroys" the jury's verdict. **Long v. Mattingly**, 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990) (citing **Foster v. Amcon Int'l, Inc.**, 621 S.W.2d at 148; **Guess v. Maury**, 726 S.W.2d 906, 913 (Tenn. Ct. App. 1986)). In determining whether a trial court's adjustment totally destroys a jury verdict, there is no set mathematical formula or percentage to use. **Meals ex rel. Meals v. Ford Motor Co.**, 417 S.W.3d 414, 420 n.8 (Tenn. 2013) (citing **Foster v. Amcon Int'l, Inc.**, 621 S.W.2d at 148). Our Supreme Court has stated that it "do[es] not intend to establish a numerical standard for reviewing additurs and remittiturs." *See Foster*, 621 S.W.2d at 148 n.9; *see also* **Webb v. Canada**, No. E2006-01701-COA-R3-CV, 2007 WL 1519536, at *4 (Tenn. Ct. App. May 25, 2007) ("While we decline to establish any particular percentage that would indicate a remittitur that has totally destroyed a jury verdict, we note that [large] remittiturs by percentage have been found acceptable by this Court and the Supreme Court of our state."). Despite this admonition, courts have used percentages as guidelines in determining the validity of an additur. *Compare Webb*, 2007 WL 1519536, at *4 (citing cases in which remitturs ranging from 40% to 59% were found not to destroy the jury's verdict), *with* **Guess**, 726 S.W.2d 906, 913 (holding that a remittitur of 75% destroyed the jury's verdict). In one case, we have noted that

> there is a lack of uniformity and certainty in cases which discuss the proper ratio of additurs or remittiturs to jury verdicts. Perhaps the best way to reconcile this case with other similar cases is to place the emphasis on determining whether or not the additur or remittitur would result in an award not only proportionally different from the jury verdict but also substantially different in absolute terms. That is to say, verdicts of relatively small amounts of money might be granted additurs or remittiturs of greater percentages than verdicts of relatively large amounts. The verdicts in this case were modest, so that the additurs do not substantially alter the end result.

**Phillips v. Perot**, No. 02A01-9704-CV-00094, 1998 WL 117325 (Tenn. Ct. App. Mar. 17, 1998) (Lanier, Sp. J., concurring).

While Tennessee courts often caution against using a mathematical formula, few cases resort to any other type of analysis when deciding whether the adjustment totally destroys a jury verdict. Some cases offer slightly more guidance in that they dicuss a "range of reasonableness" inquiry in determining whether to uphold the trial court's adjustment. In **Foster v. Amcon Int'l, Inc.**, 621 S.W.2d 142, 147 (Tenn. 1981), the Supreme Court stated

-10-

that "trial judges may suggest adjustments when the jury verdict is within the range of reasonableness, as an alternative to the practice of granting a new trial, if they are of the opinion that the jury verdict is not adequate." *Id.* (citation omitted). While Tennessee courts tend to still consider, or at least mention, the mathematical tests and formulas, the "range of reasonableness" concept offers the reviewing court more flexibility.

In this case, the Deyos argue that the trial court's additur totally destroyed the jury's verdict because the jury had determined Ms. Bonner was not entitled to any damages for her pain and suffering. The Deyos rely upon *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142 (Tenn. 1981) where the Tennessee Supreme Court held that an additur of thirty times that of the jury's verdict totally destroyed the jury's verdict. *Id.* at 148. Under the Deyos' view, the trial court in this case was not entitled to increase the jury's verdict by any amount because the jury determined that Ms. Bonner was not entitled to non-economic damages. As such, the Deyos argue that the trial court "created an award where the jury had determined none was warranted." Consequently, under the Deyo's theory, any award of non-economic damages destroys the jury's verdict. According to the Deyos, the additur here was even more improper than the trial court's additur in *Foster* increasing the jury award thirty-fold because the jury had determined the *Foster* plaintiff was entitled to at least *some* non-economic damages. Our research suggests, however, that Tennessee courts do not analyze award adjustments by the type of damages awarded as the Deyos suggest. Rather than analyzing each type of damages in a vacuum, this Court has typically considered whether the overall verdict was destroyed by the additur or remittitur. *See e.g,* ***Borne v. Celadon Trucking Services, Inc.***, No. W2013-01949-COA-R3-CV, 2014 WL 3778743, at \*21 n.22 (Tenn. Ct. App. July 31, 2014) (citing ***Adams v. Leamon***, No. E2012-01520-COA-R3-CV, 2013 WL 6198306, at \*5 (Tenn.Ct.App. Nov.25, 2013)). Thus, we decline the Deyos' invitation to disregard the $3,557.00 in economic damages awarded by the jury to Ms. Bonner as we analyze whether the adjustment to her non-economic damages totally destroys the jury verdict. Notably, the case relied upon heavily by the Deyos, *Foster*, does not use or rely on any case using the type of analysis they champion. *See generally* **Foster**, 621 S.W.2d 142; *see, e.g.*, ***Magness v. B. Hitt Elec. Co.***, 604 S.W.2d 44 (Tenn. 1980) (affirming the trial judge's remittitur as it was within the upper limit of the "range of reasonableness); ***Kaiser v. Cannon***, 529 S.W.2d 235 (Tenn. Ct. App. 1975) (affirming the trial court's additur increasing the jury award from $2,500.00 to $9,000.00).

Our research has uncovered several cases that offer some guidance to us in judging whether the adjustment of a verdict falls into the range of reasonableness, thus not totally destroying the jury's verdict. In ***Phillips v. Perot***, No. 02A01-9704-CV-00094, 1998 WL 117325 (Tenn. Ct. App. Mar. 17, 1988), the defendant appealed the trial court's decision to suggest an additur for each of the jury verdicts rendered in favor of the three plaintiffs. *Id.* at \*1. The *Phillips* plaintiffs, like Ms. Bonner, were injured when their vehicle was struck

from behind by the defendant. *Id.* One plaintiff suffered "soft tissue injuries at the cervical spine," and the second plaintiff suffered a "cervical strain with spasm." *Id.* The third plaintiff received three diagnoses: "(1) acute cervical strain, (2) acute strain of right shoulder, and (3) A-C separation." *Id.* at *2. The third plaintiff, a minor, had to wear a sling for several months during the summer and undergo physical therapy. *Id.* She was unable do engage in her normal summer activities, such as riding her bicycle. *Id.* The trial court awarded the first plaintiff $679.25, the second $525.55, and the third (the minor) $2,500.00. *Id.* The trial court suggested additurs for all three awards, increasing the first plaintiff's judgment to $3,750.00, the second to $2,250.00, and the third to $4,000.00. *Id.* Thus, the total jury verdict was increased from $3,704.80 to $10,000.00, nearly a three-fold increase.[9]

The Court of Appeals in **Phillips**, when reviewing the trial court's suggestion of additur, found that the three additurs did not totally destroy the jury's verdicts, despite the substantial increase in damages awarded to the plaintiffs. *Id.* at *3. We relied upon **Ledford v. French**, No. 02A01-9106-CH-00102, 1992 WL 1144 (Tenn. Ct. App. Jan. 7, 1992), where the trial court increased a judgment of $1,240.00 to $6,240.00,[10] and we held that the additur, although approximately five times larger than the jury's verdict, did not destroy the "integrity of the jury's verdict." **Ledford**, 1992 WL at *2. We also relied upon another similar case, **Lynch v. Turner**, No. 01A01-9109-CV-00325, 1992 WL 23122 (Tenn. Ct. App. Feb. 12, 1992), where the trial court's suggestion of additur increased the judgment from $5,000.00 to $20,000.00.[11] We affirmed, again concluding that the resulting judgment did not totally destroy the jury's verdict despite it being four times larger because it was "not so large as to bear no relation to the original verdict." *Id.* at *2. In the present case, the trial court's additurs resulted in a judgment that was roughly 3.8 times greater than the jury's verdict. Based on the foregoing, we conclude that the trial judge's adjustment, which accounts for the non-economic damages, is not so disproportionate to the jury verdict that Tennessee law would deem it to have totally destroyed it. *Compare* **Foster v. Amcon, Int'l, Inc.** 621 S.W.2d 142, 148 (Tenn. 1981) (holding that suggested additur of thirty times the jury's verdict totally destroyed the verdict), *with* **Lynch v. Turner**, No. 01A01-9109-CV-00325, 1992 WL 23122

---

[9] Individually, the additurs increased the damages of some of the plaintiffs even more. The damages of the first plaintiff was increased by approximately 5.5 times. The damages of the second plaintiff were increased by approximately four times. Finally, the damages for the third plaintiff increased approximately 1.5 times.

[10] The jury's verdict compensated the **Ledford** plaintiff for her emergency room visit, missed salary for one month, and her first doctor visit. **Ledford**, 1992 WL at *1.

[11] It is unclear what individual aspects of the **Lynch** plaintiff's claims the jury awarded damages for. However, the opinion indicates that she presented evidence as to her physical injuries, her continued pain and suffering, and her lost wages. **Lynch**, 1992 WL 23122 at *1.

(Tenn. Ct. App. Feb. 12, 1992) (affirming trial court's suggestion of additur that was four times larger than jury verdict).

Our third inquiry requires us to analyze whether the evidence presented at trial preponderates[12] against the trial court's suggested additur. *See* Tenn. Code Ann. § 20-10-102(b); *Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990). In reviewing the trial court's additur, which was made to compensate Ms. Bonner for her non-economic damages, we are mindful that "the determination of such non-pecuniary losses as pain and suffering damages involves a subjective element not present in the determination of ordinary facts." *Johnson v. Nunis*, 383 S.W.3d 122, 136 (Tenn. Ct. App. 2012). The Tennessee Supreme Court in *Meals ex rel. Meals v. Ford Motor Co.* offered the following description of non-economic damages:

> A plaintiff is also entitled to recover compensatory damages for non-economic loss or injury. *Elliott v. Cobb*, 320 S.W.3d 246, 247 (Tenn. 2010). "Non-economic damages include pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life. *Id.* at 248 n.1 (quoting *Overstreet*, 4 S.W.3d at 715). Damages for pain and suffering are awarded for the physical and mental suffering that accompany an injury. *Overstreet*, 4 S.W.3d at 715. . . . Assigning a compensable, monetary value to non-economic damages can be difficult. *See Wolfe*, 177 Tenn. at 688, 152 S.W.2d at 635 (citing *Power Packing Co. v. Borum*, 8 Tenn. App. 162 (1928)). The assessment of non-economic damages is not an exact science, nor is there a precise mathematical formula to apply in determining the amount of damages an injured party has incurred. *See McCullough v. Johnson Freight Lines, Inc.*, 202 Tenn. 596, 606, 308 S.W.2d 387, 392 (1957); *S. Ry. Co. v. Sloan* 56 Tenn. App. 380, 392, 407 S.W.2d 205, 211 (1965).

*Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 (Tenn. 2013). The Deyos arguments suggest that Ms. Bonner should be precluded from any recovery for her non-economic damages. In this case, Ms. Bonner submitted evidence suggesting that she suffered a significant injury that she has dealt with for several months, including up to the time of trial. From these facts, it was plausible for the trial court to conclude that she will continue to deal with the annoyance and aggravation related to the stiffness and pain in her neck.

---

[12]To "preponderate" is to "outweigh the evidence on the other side." *Chapman v. McAdams*, 69 Tenn. 500, 1878 WL 4399, at *2 (Tenn. 1878).

Further, although the evidence indicates that Ms. Bonner still enjoys many of the activities she did before she was injured, her enjoyment, as the record shows, is often decreased by her discomfort. Her husband's testimony and her medical records support the conclusion that she has pain and suffering as a result of her injury. We are cognizant of the evidence showing that Ms. Bonner had a pre-existing condition, but the record indicates that she never suffered any symptoms or required any treatment prior to the accident. On the other hand, she was able to testify that she had suffered an injury as a result of the car accident, one that she was aware of and sought treatment for.

Regardless of Ms. Bonner's undisputed testimony regarding her pain and discomfort after the accident, the Deyos argue that Ms. Bonner should not recover because the cause of her discomfort is a pre-existing condition, rather than an acute injury caused by the accident. We note, however, the well-established principle that "a defendant takes a plaintiff as he finds him. The fact that a party is in a weakened condition at the time of the injury is not a causal defense available to the defendant." *Fuller v. Speight*, 571 S.W.2d 840, 841 (Tenn. Ct. App. 1978). Here, Ms. Bonner testified without contradiction that the pain only began after the accident. While we agree with the Deyos that the record indicates many mitigating factors to an award of non-economic damages, we cannot conclude that the amount of $10,000.00 is so grossly out of line with the evidence to say it preponderates against it.

We bear in mind that the jury verdict is to be given great weight. *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142 (Tenn. 1981). However, "[t]hat admonition in the cases is always followed by a statement that the 'next most competent person to pass upon the matter' is the trial judge." *Lynch*, 1992 WL 23122, at *2 (citation omitted). Considering the evidence presented to the jury, which the trial judge also heard, we cannot say that the evidence preponderates against the new amount or that the suggested additur bears so little relation to the jury's verdict that it is totally destroyed.

## Conclusion

The judgment of the Circuit Court of Shelby County is hereby affirmed. Costs on appeal are taxed to Dean and Kathleen Deyo, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE