IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 7, 2021 Session

## KHALID ALMUAWI v. ANTWAN GREGORY

**Appeal from the Circuit Court for Davidson County**
**No. 18C526      Thomas W. Brothers, Judge**

_____

### No. M2020-01018-COA-R3-CV

_____

The plaintiff and defendant were in a car accident when the defendant's car rear-ended the plaintiff's car. The defendant admitted liability, leaving only the issue of damages for trial. The jury awarded the plaintiff some damages, but the plaintiff argued he was entitled to a larger sum than the jury awarded. The plaintiff also argued that the defendant's attorney misrepresented the evidence in his closing argument and that he was entitled to a new trial. We conclude that the jury's verdict was supported by material evidence and that the trial court did not abuse its discretion in denying the plaintiff's motion for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Michael D. Dillon, Nashville, Tennessee, for the appellant, Khalid Almuawi.

Parks Tedford Chastain and Cory Richard Miller, Nashville, Tennessee, for the appellee, Antwan Gregory.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

On March 8, 2017, Khalid Almuawi was driving on Charlotte Pike, in Nashville, when his car was hit from behind by a car driven by Antwan Gregory. Mr. Gregory admitted liability for the collision, and the only issue was the amount of damages for which Mr. Gregory was responsible. Mr. Almuawi filed a complaint against Mr. Gregory seeking economic and non-economic damages totaling $200,000.

A jury trial was held on February 3 and 4, 2020. Mr. Almuawi was the only witness who testified in person at trial. The other witnesses included Mr. Almuawi's wife, a friend of Mr. Almuawi, a treating physician, a treating chiropractor, and an expert witness who reviewed Mr. Almuawi's medical records following the accident. These other witnesses testified by deposition, and their depositions were presented to the jury in an audio-visual format. Mr. Almuawi sought the following economic damages: medical expenses ($27,870.21) and replacement eyeglasses ($539). The non-economic damages Mr. Almuawi sought included compensation for his past pain and suffering and his loss of the ability to enjoy life.[1] The jury awarded Mr. Almuawi damages totaling $13,796.21, and the trial court awarded this amount in its final judgment. The trial court's award included economic damages of $8,796.21 ($8,257.21 for past medical care/services and $539 for replacement eyeglasses) and non-economic damages of $5,000 ($2,500 for past pain and suffering and $2,500 for past loss of the ability to enjoy life).

Mr. Almuawi moved for a new trial or alternatively, for additur. He argued that the jury's verdict was contrary to the weight of the evidence; misrepresentations of the evidence by Mr. Gregory's attorney during his closing argument had a cumulative effect of unfair prejudice against Mr. Almuawi; and the jury's verdict was inadequate to compensate Mr. Almuawi for his medical expenses that were proximately caused by the accident. The trial court denied Mr. Almuawi's motion, stating that it was satisfied with the jury's verdict and award to Mr. Almuawi.

Mr. Almuawi appeals and raises the following issues: (1) whether there was any material evidence to support the jury verdict in favor of Mr. Gregory concerning Mr. Almuawi's claim of shoulder injury and (2) whether misrepresentations of the evidence by Mr. Gregory's attorney during closing argument affected the results of the trial.

II. ANALYSIS

A. Material Evidence to Support Jury Verdict

When a jury verdict is appealed, we are "required to take 'the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and to discard all countervailing evidence.'" *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 422 (Tenn. 2013) (quoting *Akers v. Prime Succession of Tenn., Inc.,* 387 S.W.3d 495, 501-02 (Tenn. 2012)); *see also Bell v. Roberts*, No. M2018-02126-COA-R3-CV, 2020 WL 3832995, at *2 (Tenn. Ct. App. July 8, 2020). An appellate court will not disturb a jury's verdict that is approved by the trial court if there is "any material evidence to support the award." *Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 129 (Tenn. 1980); *see also*

---

[1] By the time of trial, Mr. Almuawi was no longer suffering any ill effects from the accident and was not asking for any forward-looking damages.

*Holt v. Kirk*, No. W2017-00847-COA-R3-CV, 2019 WL 1915158, at *6 (Tenn. Ct. App. Apr. 30, 2019) ("On appeal, our task is limited to a review of the record to determine if the jury verdict is supported by any material evidence."). "Material evidence" is "'evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case.'" *Meals*, 417 S.W.3d at 422 (quoting *Knoxville Traction Co. v. Brown,* 89 S.W. 319, 321 (Tenn. 1905)). "'It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review.'" *Id.* at 423 (quoting *Hohenberg Bros. Co. v. Mo. Pac. R.R. Co.,* 586 S.W.2d 117, 119-20 (Tenn. Ct. App. 1979)). As the *Meals* Court explained, "the material evidence standard lies at the foundation of the right to trial by jury." *Id.* (citing TENN. CONST. art. I, § 6; *Truan v. Smith,* 578 S.W.2d 73, 74 (Tenn. 1979)). As a result, we are required to affirm a jury verdict "if there is material evidence to support [it]." *Id.*

Mr. Almuawi submitted evidence at trial showing that he incurred $27,900.21 in medical expenses in the year following the accident. He claimed that all of these expenses were incurred as a result of the accident. Mr. Gregory acknowledged responsibility for the expenses dating from the day of the accident, March 8, 2017, through May 3, 2017, and the jury based its award on those expenses. Mr. Gregory denied responsibility for the charges dating from July 10, 2017, through March 31, 2018, which related to treatment for the labral tear in Mr. Almuawi's right shoulder. Mr. Almuawi asserted that his shoulder was injured as a result of the accident. Mr. Gregory disputed this claim because none of Mr. Almuawi's medical records reflect that he complained of shoulder pain until April 5, nearly a month following the accident.

On the day of the accident, the Nashville Fire Department ("NFD") checked Mr. Almuawi's condition and transported him to the emergency department at Centennial Hospital. According to NFD's records, Mr. Almuawi denied back pain or neck pain but complained of "general soreness." The records from Mr. Almuawi's visit to the emergency department show that he complained of pain in his left knee, neck/back, and the left side of his face. The hospital's records state that the airbags in Mr. Almuawi's car were deployed when Mr. Gregory's car hit the rear of Mr. Almuawi's car, and Mr. Almuawi's eyeglasses were pushed into the left side of his face. X-rays were taken of Mr. Almuawi's cervical spine, lumbar spine, and his left knee at Centennial Hospital, and the x-rays showed no fractures. On March 9, 2017, the day after the accident, Mr. Almuawi went to Southside Medical, LLC, where he complained of pain in his neck, mid-back, and left knee. On March 15, 2017, Mr. Almuawi went to see his family doctor, Gary Smith. The records from Dr. Smith indicate that, during this visit, Mr. Almuawi complained of low back pain, neck pain, and left knee pain. Dr. Smith also noted an abrasion above Mr. Almuawi's left eye, where Mr. Almuawi's eyeglasses were pushed into his face by his car's airbag.

Mr. Almuawi went to St. Thomas Outpatient Rehabilitation on March 29 and April 5, 2017. On March 29, Mr. Almuawi complained of "severe pain in the lower thoracic,

lumbar and cervical spine with most activities including sitting, walking and exercise." The first time any medical records reference shoulder pain is April 5, when a physical therapist wrote that Mr. Almuawi "has had some increased pain in the R scapula area." Mr. Almuawi returned to Dr. Smith's office on April 7, 2017, and at this visit he complained of low back pain, fatigue, knee pain, neck pain, abdominal pain, and an epidermal inclusion cyst.[2] No mention is made of any shoulder pain in Dr. Smith's records dated April 7.

The appellate record includes $15,660 in charges from a chiropractor named Mahmoud Lotfi for services provided from July 10, 2017, through March 31, 2018.[3] There is no dispute that Dr. Lotfi treated Mr. Almuawi for a labral tear to his right shoulder. The only dispute regarding Dr. Lotfi's treatment and charges is whether the labral tear was proximately caused by the car accident. Mr. Almuawi claims it was. Mr. Gregory disagrees.

Mr. Almuawi presented testimony from Dr. David West, a medical expert, who opined that Mr. Almuawi's shoulder injury was causally connected to the accident on March 8, 2017. Dr. West testified as follows:

Q: Upon your review of all the records, what would you say, what is your opinion about the injuries that Mr. Almuawi suffered from the car crash of March 2017?

A: I mean, I would state that his right shoulder certainly was affected predominantly and neck pain from the accident itself.

Mr. Almuawi also presented testimony from Dr. Lotfi, who was Mr. Almuawi's treating chiropractor. Dr. Lotfi testified that the car accident was the proximate cause of Mr. Almuawi's labral tear.

Mr. Gregory presented testimony from Dr. Matthew Willis, a medical expert whom Mr. Almuawi went to see in October 2017 and January 2018. Dr. Willis opined that the accident may have caused the shoulder injury, but he was unwilling to state definitively that the accident caused the labral tear. Dr. Willis stated that labral tears in the shoulder can occur from a number of causes, including lifting weights, repetitive use, and pulling injuries. Because he did not see Mr. Almuawi until seven months following the car accident, Dr. Willis stated that he was unable to causally connect the labral tear to the accident. When he was presented with the medical records showing that Mr. Almuawi

---

[2]The abdominal pain and cyst do not appear to be related to the car accident.

[3]The record shows that the chiropractor's statement of charges was provided to Mr. Gregory's attorney prior to trial, but the statement was not submitted as an exhibit at trial.

experienced a hard impact from the accident in March and that he first complained of shoulder pain in early April, Dr. Willis stated that "seeing pain, you know, three, four weeks [later], that's plausible for a traumatically induced labral tear." Dr. Willis continued:

> But again, this is the first time, today, that I've seen these records. So if you're asking, this is much more consistent with a labral tear that's acute at the time of an accident than somebody walking in seven months later saying, "Oh, by the way, I hurt myself, and I have a lawyer." . . . [S]omebody who complains of pain in three or four weeks, a lot of shoulder pain, that is consistent with a traumatic labral tear, certainly from a high-energy car accident, yes.

When asked his opinion about whether Mr. Almuawi "suffer[ed] a labral tear because of the trauma of the car crash," Dr. Willis answered:

> I can't say with a degree of medical certainty that he did. I've got a record of two therapy sessions' worth of shoulder pain, and that's it. I don't have any other treating records. I don't have an ER record of shoulder pain. I don't have an initial record of therapy [sic] pain. I have a delayed record of shoulder pain which makes it more plausible, but you're talking about - - more likely than not means greater than 51 percent likelihood. I can't say that based on the records I have in front of me. So that's the best I can do. . . . Because seven months later it is impossible for me to determine causation seven months later. I take him at his word. I write down that he says that it occurred during the accident. But there is no way for me to determine within a medical degree of certainly causation at the time of an initial visit seven months after an accident. I can't do that. There's no way to do that as a medical provider. . . . But I'd say it's a lot more likely that it came from the car accident, considering his complaints of shoulder pain.

Mr. Almuawi had the burden of proving that the car accident was the "cause in fact" of the damages for which he sought compensation from Mr. Gregory. *See Bell*, 2020 WL 3832995, at *3. "'Causation, or cause in fact, means that the injury or harm would not have occurred "but for" the defendant's negligent conduct.'" *Id*. (quoting *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)). This court has stated that, "[a]s a general rule, the causation of a medical condition must be established by testimony from a medical expert." *Miller v. Choo Partners, L.P.*, 73 S.W.3d 897, 901 (Tenn. Ct. App. 2001) (citing *Thomas v. Aetna Life & Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991)); *see also Bell*, 2020 WL 3832995, at *3.

> The weight and value to be given expert testimony is a question for the jury. Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight

and credibility of each in light of all the facts and circumstances of the case. Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations.

*State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002) (citations omitted). A jury may not ignore evidence arbitrarily, but "a jury is not bound to accept the testimony of experts where the evidence is contested." *Id.* at 556.

Mr. Almuawi argues on appeal that Dr. Willis had no rational basis to conclude that he could not evaluate the cause of Mr. Almuawi's shoulder labral tear "simply due to the passage of time." He also argues Dr. Willis used an improper standard of proof in opining that he could not causally relate the labral tear with the accident.[4] Dr. Willis's videotaped deposition was taken on July 16, 2019. Mr. Almuawi was aware of Dr. Willis's testimony over six months before the trial. Mr. Almuawi did not move before or during the trial to exclude or redact portions of Dr. Willis's testimony, and it is too late for him to complain about its contents now because he is unhappy with the jury's verdict.

Even without considering Dr. Willis's testimony, we conclude there was material evidence to support the jury's verdict disallowing costs related to treatment for Mr. Almuawi's labral tear. The evidence showed that Mr. Almuawi did not complain about pain in his shoulder until close to a month after the accident. He saw several different providers before April 5, 2017, and none of the records from any of these visits reflect that Mr. Almuawi complained about any shoulder pain until the visit to St. Thomas Outpatient Rehabilitation on April 5. Despite testimony by Drs. West and Lotfi causally connecting the accident to the labral tear, material evidence was introduced to support the jury's verdict. As a result, we are bound to affirm the verdict and final judgment entered by the trial court.

---

[4]At different times during his deposition, Dr. Willis stated "I don't know that for sure" and "I can't look at you and say that that's definitely what happened" when describing the criteria he used to reach an opinion about the cause of Mr. Almuawi's labral tear. However, before the jurors were sent out to begin their deliberations, the trial judge instructed the jury regarding Mr. Almuawi's burden of proof, which the judge described as "a preponderance of the evidence." The judge described this standard as "that amount of evidence that causes you to conclude that an allegation is probably true. To prove an allegation by the preponderance of the evidence, a party must convince you that the allegation is more likely true than not true." The judge also told the jury: "The proof of causation cannot rest on conjecture, and the mere possibility of such causation is not enough to sustain the burden of proof. Causation must be proved by a preponderance of the evidence."

B.  Misrepresentations Made During Closing Argument

Following the close of evidence, both Mr. Almuawi's and Mr. Gregory's attorneys made closing arguments to the jury.  Mr. Almuawi contends that Mr. Gregory's attorney, Parks T. Chastain, misrepresented some of the evidence that was presented and that these misrepresentations unfairly prejudiced Mr. Almuawi to such an extent that he is entitled to a new trial.  The portions of Mr. Chastain's closing to which Mr. Almuawi objects include Mr. Chastain's representation of a portion of Mr. Almuawi's wife's testimony, his characterization of demonstrative evidence Mr. Almuawi presented during the trial, and distinctions he made among the expert witnesses to convince the jury that Dr. Willis was the most qualified expert to testify about causation.

### Ms. Almuawi's Testimony

English is not Mr. Almuawi's wife's first language, and she was unable to find the right word to describe something Mr. Almuawi had around his neck when he came home on March 8, 2017, following the accident.  Ms. Almuawi was asked to describe Mr. Almuawi's condition when he came home from the hospital, and she responded:

> I would tell you what I thinking, but I forget because two years ago.  But he has something in his eyes like black and big something and he cut here.  And his shoulder he wear something like - - I don't know what is name, but for to care the - - his arm.  And he not walk - - walk good.  He like do it - - I don't know how can I say it, but he not - - he not walk good way.

On cross examination, Mr. Chastain asked Ms. Almuawi what she was describing:

> Q:  You testified a few minutes ago and you did this sort of hand gesture like this?
>
> A:  Yes.  I didn't know what is name - - what is here and for this care for - - care for the arm.
>
> . . .
>
> Q:  Was it a sling?
>
> A:  No sling, like - -
>
> Q:  Okay.  Describe - - describe what it looked like, if you can?
>
> A:  It is not what can I say for English, but it is - -

Q: Did it - - was it something around his neck?

A: Yes. It put - -

Q: And around the arm?

A: Yes. Just care for the arm, yes.

During his closing argument, Mr. Chastain represented that Ms. Almuawi testified that her husband was wearing a neck brace when he came home from the hospital following the accident and pointed out that the medical bills did not include a charge for a neck brace.

<u>Mr. Almuawi's Demonstration of Prayer Movements</u>

During his live testimony at the trial, Mr. Almuawi described his physical limitations following the accident. He testified that he was a Muslim and that Muslims pray several times a day. He asked whether he could demonstrate how he prayed, and after receiving permission, Mr. Almuawi stepped outside the witness box onto the floor in front of the jury. Mr. Almuawi bent over, sat back on his folded legs, and bent his head to the floor, using his arms to support his upper body as he lowered his head to the floor.[5] Mr. Almuawi testified that he was unable to pray in the normal way for about two months after the accident due to his injuries.

During his closing argument, Mr. Chastain told the jury:

What did [Mr. Almuawi] tell you this morning? And this is pretty key. How long did it take him to resume his prayer movements? You saw him do them. Mr. Dillon asked him, and he said a couple of months. And I clarified that because, if you'll notice, in his prayer movements, the last movement, when you lay down, when you sit down and kneel, is where do your hands go? [Mr. Chastain raised his hands and arms above the shoulder.] What couldn't he do, supposedly, with his shoulder injury? He could not put his hands above his head. Yet he told you this morning that is exactly what he did after two months.

Contrary to Mr. Chastain's characterization of Mr. Almuawi's demonstration, Mr. Almuawi did not raise his arms above his head when demonstrating how he normally prayed.

---

[5]The trial transcript consisted of two CD-Roms rather than the usual typed volumes, so the Court of Appeals was able to observe Mr. Almuawi's demonstrative evidence.

- 8 -

## Distinction Among Expert Witnesses

When describing the testimony of Drs. West, Lotfi, and Willis, Mr. Chastain pointed out that Dr. Willis was the only one who reviewed the actual x-rays taken at Centennial immediately following the accident. According to Mr. Chastain, the other experts reviewed only the reports but did not see the images themselves. As Mr. Almuawi points out, his shoulder was not x-rayed at Centennial; only his cervical spine, lumbar spine, and left knee were x-rayed. As a result, Mr. Almuawi argues, Mr. Chastain's focus on Dr. Willis as the only expert who reviewed the actual images "was a completely false representation, since no diagnostic studies of the shoulder were taken at the emergency room."

A trial court has discretion in determining whether a party is entitled to a new trial when an opposing counsel makes misrepresentations during his or her closing argument. *Volner v. Vantreese Disc. Pharmacy, Inc.*, No. 02A01-9712-GS-00298, 1999 WL 350899, at *2 (Tenn. Ct. App. May 28, 1999). "'A trial court is given wide latitude in granting a motion for new trial, and a reviewing court will not overturn such a decision unless there has been an abuse of discretion.'" *Id.* (quoting *Loeffler v. Kjellgren,* 884 S.W.2d 463, 468 (Tenn. Ct. App. 1994)). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). For an appellate court to find an abuse of discretion in a trial court's denial of a motion for a new trial based upon an opposing counsel's closing argument, the argument must be "'clearly unwarranted and made purely for the purpose of appealing to passion, prejudices and sentiment, which cannot be removed by the trial judge's sustaining the objection of opposing counsel, or unless we affirmatively find that such argument affects the results of the trial.'" *Volner*, 1999 WL 350899, at *2 (quoting *Doochin v. U.S. Fidelity & Guar. Co.*, 854 S.W.2d 109, 116 (Tenn. Ct. App. 1993)). Further, in cases where appellate courts reverse the trial court's denial of a motion for a new trial, the alleged misconduct tends to be "persistent." *Id.* (citing *Doochin*, 854 S.W.2d at 116).

The trial judge in this case instructed the jury "to decide this case only from the evidence which was presented at this trial," and cautioned them that "what is said by the lawyers during the trial is not evidence." Mr. Almuawi's attorney did not object to Mr. Chastain's alleged misrepresentations or mischaracterizations of the evidence, and he had an opportunity to correct Mr. Chastain's assertions when he made his closing comments following Mr. Chastain's closing argument. Mr. Almuawi is correct that Ms. Almuawi never used the word "brace" when describing her husband's condition upon his return home from the hospital, and Mr. Almuawi did not raise his arms above his head when demonstrating how he normally prayed. With regard to distinguishing the medical experts, Mr. Chastain did not misrepresent the evidence; instead, he characterized the evidence presented in the light that was most beneficial to his client, Mr. Gregory. The jury heard and saw the evidence that Mr. Chastain described in his closing argument, and they were

able to determine whether or not Mr. Chastain mischaracterized what they heard and saw. We conclude that Mr. Chastain's misrepresentations and characterizations were not persistent or prejudicial, and there is no basis on which to find that these arguments affected the results of the trial. As a result, we hold that the trial court did not abuse its discretion in denying Mr. Almuawi's motion for a new trial.

III. CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Khalid Almuawi, for which execution may issue if necessary.

_/s/ Andy D. Bennett_____
ANDY D. BENNETT, JUDGE